## IN THE UNITED STATE DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UTSTARCOM, INC.,                          )
                                          )
            Plaintiff,                    )       Ca  07cv2582
                                          )          JUDGE LINDBERG
      vs.                                 )          MAG. JUDGE NOLAN
                                          )
STARENT NETWORKS, CORP.; JOHN             )
("ANDY") CAPENER; NOEL CHARATH;           )    JURY TRIAL DEMANDED
DALE ELIASON; BRIAN ESPY; TROY            )
GABEL; MATTHEW HARPER; TODD               )
KELLY; NICK LOPEZ; SANIL                  )
PUTHIYANDYIL; RAJESH                      )
RAMANKUTTY; CHARLES RYGULA;               )
PAUL SHIEH; GENNADY SIROTA;               )                **FILED**
AMIT TIWARI; JAMES ("JIM")                )
WININGER; MARK ZARICH,                    )          J .N
                                          )          MAY X 8 2007
            Defendants.                   )          MAY 8, 2007
                                                     MICHAEL W. DOBBINS
                                                     CLERK, U.S. DISTRICT COURT

### COMPLAINT

Plaintiff UTStarcom, Inc. ("UTSI"), by and through its undersigned attorneys, and as and for its complaint against Defendant Starent Networks, Corp. ("Starent"), John ("Andy") Capener, Noel Charath, Dale Eliason, Brian Espy, Troy Gabel, Matthew Harper, Todd Kelly, Nick Lopez, Sanil Puthiyandyil, Rajesh Ramankutty, Charles Rygula, Paul Shieh, Gennady Sirota, Amit Tiwari, James ("Jim") Wininger, and Mark Zarich (collectively, "Defendants"), alleges and states as follows:

### PARTIES

1.     Plaintiff UTSI is a corporation incorporated under the laws of the State of Delaware in the early 1990s. UTSI began its business in Alameda, California.

2.     UTSI acquired substantially all of the assets of 3Com Corporation's CommWorks business unit, which it continued (and continues) to operate (the "Business Unit"), located in Rolling Meadows, Illinois in approximately May 2003.

3.  With the acquisition of the Business Unit, UTSI acquired the personnel and facilities for the Business Unit, including, but not limited to, research and development, engineering, sales, marketing, manufacturing and administration. All of these personnel and facilities for the Business Unit, with the exception of certain sales personnel, were, and are still, located in Rolling Meadows, Illinois and surrounding areas.

4.  Almost all of UTSI's operations related to the acquired Business Unit have operated and continue to operate today from UTSI's location in Rolling Meadows, Illinois. UTSI has several hundred employees and others involved in its Business Unit operations in Illinois.

5.  Upon information and belief, Starent is a corporation organized and existing under the laws of the State of Delaware. Starent is doing business and has a place of business in Schaumburg, Illinois. Starent is now unlawfully making, using and selling products and services that unlawfully compete with UTSI, as more fully described herein.

6.  Defendant Matthew Harper was a consulting (senior) engineer for the Business Unit, was an inventor and architect for the hardware and software platforms for the products of the Business Unit, and was completely versed in the relevant products and services of the Business Unit. Upon information and belief, Mr. Harper left the Business Unit and is now is a software architect for Starent, engineering the Starent's products' hardware and software platforms. Upon information and belief, Mr. Harper used to reside in Cook County and DuPage County, Illinois, and now resides on 22 Ticklefancy Lane in Salem, New Hampshire 03079.

7.  Defendant Todd Kelly was first a network consultant and later a manager for global strategic technology for wireless products for the Business Unit. Upon information and belief, Mr. Kelly left the Business Unit and is now Director of Network Consulting and Sales and Support at Starent. Upon information and belief, Mr. Kelly resides in Cook County, Illinois.

2

8. Defendant Nick Lopez was a senior product manager for the Business Unit. Upon information and belief, Mr. Lopez left the Business Unit and is now Vice President of Strategic Alliances at Starent. Upon information and belief, Mr. Lopez resides in Cook County, Illinois.

9. Defendant Brian Espy was North American Director of Sales for Wireless Products for the Business Unit. Upon information and belief, Mr. Espy became Vice President of Sales at Starent. Upon information and belief, Mr. Espy resides at 5212 West 166th Street, Stilwell, Kansas 66085.

10. Defendant Paul Shieh was a principal architect and product manager for the products and services of the Business Unit. Upon information and belief, Mr. Shieh left the Business Unit and became the General Manager of Greater China and Vice President of Technology Development for Starent.

11. Defendant Gennady Sirota was Director of Wireless Product Management for the Business Unit. Upon information and belief, Mr. Sirota left the Business Unit and became the Vice President of Product Management and Marketing for Starent. Upon information and belief, Mr. Sirota resides in Lake County, Illinois.

12. Defendant Amit Tiwari was Director of Product Management for the Business Unit. Upon information and belief, Mr. Tiwari left the Business Unit and became the Vice President Solutions Development for Starent. Upon information and belief, Mr. Tiwari resides in Lake County, Illinois.

13. Defendant John "Andy" Capener was a manager in marketing and public relations for the Business Unit. Upon information and belief, Mr. Capener left the Business Unit and became the Director of Marketing for Starent. Upon information and belief, Mr. Capener now resides in 84 Towne Hill Road, Haverhill, Massachusetts 01835.

14. Defendant Noel Charath was a product manager for the wireless group of the Business Unit. Upon information and belief, Mr. Charath left the Business Unit and is now a senior systems engineer for Starent. Upon information and belief, Mr. Charath

3

used to reside in Cook County, Illinois, and now resides at 139 Orchard Hill Road, Haverhill, Massachusetts 01835.

15.    Defendant Dale Eliason was a product manager for the wireless group of the Business Unit. Upon information and belief, Mr. Eliason left the Business Unit and became a product manager for Starent. Upon information and belief, Mr. Eliason used to reside in Lake County, Illinois, and now resides at 1511 Deer Point Way, Reston, Virginia 20194.

16.    Defendant James ("Jim") Wininger was the head of proposals for the Business Unit. Upon information and belief, Mr. Wininger left the Business Unit and joined Starent to be responsible for responding to requests for proposals. Upon information and belief, Mr. Wininger resides at 14223 Redmond Drive, Huntley, Illinois 60142.

17.    Defendant Troy Gabel was a network consultant for the Business Unit. Upon information and belief, Mr. Gabel left the Business Unit and joined the sales force at Starent. Upon information and belief, Mr. Gabel resides at 14609 Windsor Street, Overland Park, Kansas 66224.

18.    Defendant Sanil Puthiyandyil was a senior engineer for the Business Unit. Upon information and belief, Mr. Puthiyandyil left the Business Unit and is now a manager of development for Starent. Upon information and belief, Mr. Puthiyandyil used to reside in Mount Prospect, Illinois and now resides at 10 Georgetown Drive, Nashua, New Hampshire 03062.

19.    Defendant Rajesh Ramankutty was a lead/senior software engineer for the Business Unit. Upon information and belief, Mr. Ramankutty left the Business Unit and is now consulting software engineer for Starent. Upon information and belief, Mr. Ramankutty used to reside in Mount Prospect, Illinois and now resides at 6 Newcastle Drive, # 6, Nashua, New Hampshire 03060.

4

20.    Defendant Charles Rygula was a technical writer and then became a product manager for the Business Unit. Upon information and belief, Mr. Rygula left the Business Unit and is now a technical writer for Starent. Upon information and belief, Mr. Rygula resides in Cook County, Illinois.

21.    Defendant Mark Zarich was in sales for the Business Unit. Upon information and belief, Mr. Zarich left the Business Unit and joined the sales force at Starent. Upon information and belief, Mr. Zarich resides at 232 South Duffers Court, Andover, Kansas 67211.

22.    Upon information and belief, in engaging in the acts alleged herein, each of the aforesaid defendants was the agent (or alter ego) of each of the other defendants and was acting in the course and scope of such agency and with the permission, consent and ratification of their co-defendants.

23.    As a result of their prior relationships with the Business Unit, upon information and belief, each of the individual defendants and later Starent had access to and did acquire technical and non-technical information, data, formulas, patterns, programs, compilations, devices, methods, techniques, drawings, processes, concepts, implementations, financial data and/or customer and supplier lists belonging to the Business Unit, which is now owned by UTSI (the "Confidential and Proprietary Information").

24.    Upon information and belief, Starent transacts business and/or has transacted business within this judicial district and is subject to the jurisdiction of this Court, having made, operated, used, offered for sale, and/or sold in this judicial district and elsewhere in the United States its ST16 intelligent mobile gateway and the ST40 multimedia code platform ("the ST Products").

25.    Upon information and belief, the individual defendants are subject to the jurisdiction of this Court, as they either reside in this judicial district and/or have committed acts which have injured UTSI within this judicial district.

## JURISDICTION AND VENUE

26.    This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1 *et seq.*

27.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).  This Court has venue pursuant to 28 U.S.C. §§ 1391 and/or 1400(b).

28.    This Court has supplemental jurisdiction over the non-federal question claims pursuant to 28 U.S.C § 1367 because they arise out of the same facts and acts as those giving rise to the federal claims.

## FACTUAL BACKGROUND

**Background of the Business**

29.    UTSI specializes in data communications products, including networking products and wireless products.  UTSI acquired the Business Unit including the products and process, and intellectual property, and these products and services relate to telecommunications.   The product lines of the Business Unit consist of equipment (including computer hardware and software) that facilitates wireless transmission of data. For example, products allowing a cellular telephone user to access the Internet or check e-mail through use of the user's cellular telephone.

30.    UTSI manufactures and sells its Business Unit's products and services. Such products are purchased and used by cellular service providers (such as Verizon Wireless and Sprint Nextel) and their customers.  These companies provide products and services using UTSI's products and services directly to cellular telephone customers. The Business Unit (i.e., UTSI) has been a leading provider of these products and services for years.

31.    Currently, many wireless access service providers use what is known in the industry as "3G" (third-generation) standard for wireless data transmission. This technology is a packet based wireless data transmission system.

32.    The Business Unit's network products provide much of the infrastructure that transmits data from a cellular telephone (or other wireless device, such as a personal digital assistant) to the Internet or e-mail server. These systems work with and through the Internet, using both simple Internet Protocols (IP) and mobile Internet Protocols (mobile IP).

33.    The Business Unit (now UTSI) markets and sells products known as PDSNs (Packet Data Serving Nodes) and HA (Home Agent) server components, for use in both simple IP and mobile IP system, to the cellular telephone service providers. UTSI also markets and sells AAA (authentication, accounting and administration) servers.

34.    Evolution-Data Optimized ("EV-DO") is a wireless broadband data standard that has been deployed by several cellular telephone service providers. EV-DO is typically used to provide broadband-speed Internet access to cellular telephone users. EV-DO's recent version is often referred to as Ultra Mobile Broadband.

35.    A virtual private network ("VPN") is a private communications network often used by companies to communicate over a public network, such as the Internet. Secure VPN communication protocols include Internet Protocol security ("IPSec").

36.    UTSI markets and sells products which allow or enable EV-DO and VPN services.

37.    UTSI's PDSN and HA products for 3G networks were developed over a substantial period of time at a cost of many millions of dollars (to both the Business Unit and UTSI).  These products include Confidential and Proprietary Information and technology and other features that UTSI (both itself and through 3Com Corp. assignments) originated.

**Protection of Confidential Information**

38.    The Business Unit took a number of active steps to ensure that access to its Confidential and Proprietary Information was limited and its confidentiality maintained.

39.    The Business Unit instituted Confidential and Proprietary Information and intellectual property protection policies setting forth steps to make its employees aware of these policies, including (1) providing brochures describing these policies to all new employees, (2) posting the contents of the brochure on an internal server viewable by all employees, and (3) providing copies of the confidential and proprietary information and intellectual property protection policies themselves to all employees. The Business Unit also affirmatively advised its employees to become familiar with the policies and to take necessary steps to enforce compliance within their areas of responsibility.

40.    It was the Business Unit's customary practice to require all employees to sign an agreement containing non-disclosure and non-solicitation provisions. These agreements prohibit the employee from disclosing (and/or using) any Confidential and Proprietary Information to any outside party, and from soliciting the Business Unit employees to leave for a set period of time after that employee leaves the Business Unit.

41.    The Business Unit limited access to its Confidential and Proprietary Information. A password and username were typically required to access servers that contain confidential technical and other information. This applied, for example, to research and development servers that maintained the source code for the products, software applications and technical specifications, and to servers containing its technical database, which maintained (among other things) functional specifications for the Business Unit's products. Access is limited such that only persons with a need to work in a particular technological area have access to the servers for that area.

42.    The Business Unit limited access to its facilities, including those containing the marketing, sales, engineering, manufacturing and administrative information as well as to its research and development laboratories. Access was and is only through the use of an electronic key-card access security system. Only employees with approved electronic key-cards could and can enter the facilities. A more restrictive level of

approval was and is required to enter the research and development laboratories within those facilities.

43.   The Business Unit has carefully kept its Confidential and Proprietary Information confidential, and has policed and enforced its rights in its Confidential and Proprietary Information.

**Background of Starent**

44.   Upon information and belief, Starent was founded in August 2000.

45.   Upon information and belief, in or around mid to late 2003, Starent began offering PDSNs, HAs and other products for 3G wireless networks to cellular telephone service providers in the United States.  These products of Starent are designated as its "ST Products."

46.   Upon information and belief, the defendants used the Confidential and Proprietary Information of the Business Unit to develop, manufacture and market the ST Products.

47.   Upon information and belief, Starent's ST Products incorporate, use and/or are based in significant part on the Business Unit's Confidential and Proprietary Information.   For example, upon information and belief, Starent's 3G ST Products include some of UTSI's proprietary VPN and EV-DO features.

48.   Upon information and belief, Starent is now directly competing with UTSI by offering to sell the ST Products to many of the same customers to whom UTSI is offering its 3G products and services.

49.   Upon information and belief, Starent's use of the Business Unit's Confidential and Proprietary Information directly harms UTSI's ability to sell its 3G wireless products.

**Starent's Hiring of UTSI Employees**

50.     Upon information and belief, since Starent was founded and thereafter, Starent has engaged in a pattern of hiring UTSI's employees in an effort to improperly hasten the development of the ST Products.

51.     During their employment with the Business Unit, each of the individual defendants were privy and had access to and acquired valuable Confidential and Proprietary Information. .For example, upon information and belief, trade secret and confidential information pertaining to the Business Unit's 3G wireless technology, including the system architecture for its PDSN and HA products, was unlawfully acquired by Starent from the individual defendants.

52.     All of the individual defendants had intimate knowledge concerning the Business Unit's proprietary business strategy with respect to 3G wireless products. These proprietary business strategies were and are Confidential and Proprietary Information of the Business Unit (now owned by UTSI).

53.     On information and belief, the individual defendants that joined the Business Unit prior to December 1997 signed nondisclosure and/or non-solicitation agreements with the Business Unit's predecessor, U.S. Robotics (on December 31, 1997, U.S. Robotics merged into 3Com).  As a result of the merger, 3Com Corp. became the successor in interest to these agreements.  As a result of the acquisition of the Business Unit by UTSI, UTSI then became the successor in interest to these agreements.

54.     Upon information and belief, Starent required the Business Unit's employees to enter into non-disclosure agreements with Starent prior to allowing such employees to interview for positions at Starent.

55.     Upon information and belief, Mr. David Aubin Jr. was a senior software engineer at the Business Unit and left in or around November 1999.  Upon information and believe, Mr. Aubin Jr. joined Starent in or around April 2001 through July 2002. Upon information and belief, Mr. Aubin Jr. held the same or a similar position at both the

10

Business Unit and Starent, as a principal software engineer. Upon information and belief, Mr. Aubin Jr. may have deconstructed UTSI software code for Starent, which software code was Confidential and Proprietary Information.

56.    Upon information and belief, Mr. Steve Batsford was technical writer for the Business Unit and had access to and did acquire Confidential and Proprietary Information. Upon information and belief, Mr. Batsford joined Starent in or around February 2003 and holds the same or similar position as he did at the Business Unit, as a technical writer.  Upon information and belief, Mr. Batsford is now Starent's senior technical writer.

57.    Upon information and belief, Mr. Capener was a manager in marketing and public relations at the Business Unit. While there, Mr. Capaner had access to and did acquire Confidential and Proprietary Information, including all of the Business Unit's marketing materials and customer information and was familiar with the strengths, weaknesses, pricing, performance and features of its products.  Upon information and belief, Mr. Capener is the Director of Marketing for Starent, now selling Starent products to exactly the same customers that he did while he worked at the Business Unit.

58.    Upon information and belief, Mr. Charath was a product manager at  the Business Unit. Upon information and belief, Mr. Charath left the Business Unit in 2002 to become a. senior systems engineer at Starent, which is the same or a similar position as his position at the Business Unit.  Upon information and belief, while at the Business Unit, Mr. Charath was a product manager for the remote access service ("RAS") group. Upon information and belief, the technology of the RAS group included Confidential and Proprietary Information and is the same or similar to that used by Starent.

59.    Upon information and belief, Mr. Eliason was a product manager for the wireless group at the Business Unit. Upon information and belief, Mr. Eliason left the Business Unit in or around 2000 to become a product manager at Starent.  Upon information and belief, Mr. Eliason held the same or a similar position at both the

11

Business Unit and Starent. Upon information and belief, Mr. Eliason no longer works for Starent. Upon information and belief, while at the Business Unit, Mr. Eliason had access to and did acquire Confidential and Proprietary Information, including the Business Unit's marketing materials and customer information and was familiar with the strengths, weaknesses, pricing, performance and features of its products. Upon information and belief, while at the Business Unit, Mr. Eliason maintained the Business Unit's customer contacts with KDDI and Motorola and then used those same contacts for the benefit of Starent

60.   Upon information and belief, Mr. Espy was North American Director of Sales for Wireless Products for the Business Unit. Upon information and belief, in or around January 2003, Mr. Espy left the Business Unit to become Vice President of Sales at Starent. Upon information and belief, Mr. Espy solicited and convinced several of his staff to join him at Starent. Upon information and belief, Mr. Espy held the same or a similar position at both the Business Unit and Starent. Upon information and belief, while at the Business Unit, Mr. Espy worked on the Sprint and Verizon accounts and then worked on the same accounts for Starent. Upon information and belief, while at the Business Unit, Mr. Espy had access to and did acquire Confidential and Proprietary Information, including all of the Business Unit's marketing materials and customer information and was familiar with the strengths, weaknesses, pricing, performance and features of its products. Upon information and belief, Mr. Espy is no longer working for Starent.

61.   Upon information and belief Mr. Gabel was a network consultant for the Business Unit. Upon information and belief, Mr. Gabel left the Business Unit in or around November 2002 to work in sales for Starent. Upon information and belief, Mr. Gabel left the Business Unit on the very same day with one of his co-workers, Mr. Zarich, who also left the Business Unit for Starent. Upon information and belief, Mr. Gabel held the same or a similar position both at the Business Unit and at Starent. Upon

12

information and belief, while at the Business Unit, Mr. Gabel worked on the Sprint account and then worked on the same account for Starent. Upon information and belief, while at the Business Unit, Mr. Gabel had access to and did acquire Confidential and Proprietary Information, including all of the Business Unit's marketing materials and customer information and was familiar with the detailed technical aspects, strengths, weaknesses, pricing, performance and features of its products. Upon information and belief, Mr. Gabel is no longer at Starent. Upon information and belief, Mr. Gabel destroyed incriminating evidence and Confidential and Proprietary Information, and took the same with him when he destroyed his computer hard drive prior to leaving the Business Unit, so that the full extent of his misappropriation and destruction could not be discovered.

62.    Upon information and belief, Mr. Harper, was a consulting (senior) engineer for the Business Unit who left in September 2000 to become Starent's platform architect, including the hardware and software for the ST Products. Upon information and belief, Mr. Harper was an architect of at least one of the Business Unit's PDSN products and thus had access to and did acquire Confidential and Proprietary Information, including everything about the PDSN products of the Business Unit, as well as all source code. Upon information and belief, Mr. Harper took the knowledge of the Confidential and Proprietary Information he gained while at the Business Unit and used it improperly and unlawfully to develop Starent's ST Products. Upon information and belief, Mr. Harper held the same or a similar position both at the Business Unit and at Starent, and Mr. Harper was the architect of the platforms for the products of both the Business Unit and Starent.

63.    Upon information and belief, Mr. Kelly was a network consultant and then a manager for global strategic technology in wireless at the Business Unit. Upon information and belief, Mr. Kelly left the Business Unit in or around November 2002 to become Director of Network Consulting and Sales and Support for Starent. Upon

information and belief, Mr. Kelly sells Starent's products to the people who make the purchasing decisions. Upon information and belief, Mr. Kelly held the same or a similar position both at the Business Unit and at Starent. Upon information and belief, while at the Business Unit, Mr. Kelly worked on the Sprint account and then worked on the same account for Starent. Upon information and belief, while at the Business Unit, Mr. Kelly had access to and did acquire Confidential and Proprietary Information, including all of the Business Unit's marketing materials and customer information and was familiar with the detailed technical aspects, strengths, weaknesses, pricing, performance and features of its products. Upon information and belief, Mr. Kelly also destroyed his computer hard drive prior to leaving the Business Unit to prevent the full disclosure of his misappropriation and destruction of Confidential and Proprietary Information of the Business Unit.

64.     Upon information and belief, Mr. Lopez was a senior product manager at the Business Unit. In or around mid-2001, Mr. Lopez left the Business Unit for Starent to work in business development and is now Vice President of Business Alliances. Upon information and belief, while the Business Unit, Mr. Lopez was a product manager for the PDSN products and other wireless products and thus had access to and did acquire Confidential and Proprietary Information, including everything about the PDSN products, as well as the source code, and was familiar with the strengths, weaknesses, pricing, performance and features of its products. Upon information and belief, Mr. Lopez held the same or a similar position both at the Business Unit and at Starent.

65.     Upon information and belief, Mr. Tim Mortsolf was senior software engineer at the Business Unit. Upon information and belief, Mr. Mortsolf left the Business Unit in or around 2001 for the same or a similar position. Upon information and belief, while at the Business Unit, Mr. Mortsolf worked with the PDSN products and had access to and did acquire Confidential and Proprietary Information, including everything about the PDSN products, as well as the source code.

14

66.    Upon information and belief, Mr. Puthiyandyil was a senior engineer at the Business Unit.  Upon information and belief, Mr. Puthiyandyil left the Business Unit in or around spring 2001 to become a manager of development at Starent.    Upon information and belief, Mr. Puthiyandyil held the same or similar positions at both the Business Unit and Starent.  Upon information and belief, while at the Business Unit, Mr. Puthiyandyil had access to and did acquire Confidential and Proprietary Information as a senior engineer in the RAS group.  Upon information and belief, the technology of the RAS group is the same or similar to that used by Starent..  Upon information and belief, Mr. Puthiyandil was working on the PDSN products and it was anticipated, prior to him leaving for Starent, that based on his intimate knowledge and participation, he would be promoted to the position of an architect of one of the Business Unit's PDSN products.

67.    Upon information and belief, Mr. Shaji Radhakrishnan was an engineer for the Business Unit and had access to and did acquire Confidential and Proprietary Information.  Upon information and belief, Mr. Radhakrishnan left the Business Unit in or around April 2001 to become an engineer for Starent.  Upon information and belief, Mr. Radhakrishnan held the same or similar positions at both the Business Unit and Starent.  Upon information and belief, while at the Business Unit, Mr. Radhakrishnan was an engineer in the RAS group.  Upon information and belief, the technology of the RAS group is the same or similar to that used by Starent.

68.    Upon information and belief, Mr. Ramankutty was a lead/senior software engineer at the Business Unit.  Upon information and belief, Mr. Ramankutty left the Business Unit in or around June 2001.  Upon information and belief, Mr. Ramankutty is a consulting (senior) software engineer for Starent.  Upon information and belief, Mr. Ramankutty held the same or similar positions at both the Business Unit and Starent  Upon information and belief, while at the Business Unit, Mr. Ramankutty was an engineer in the RAS and wireless groups. Upon information and belief, while at the Business Unit, Mr. Ramankutty worked with the PDSN products and had access to and

did acquire Confidential and Proprietary Information, including detailed information about the PDSN products, as well as the source code.

69.     Upon information and belief, Mr. Rygula was a product manager at the Business Unit. Upon information and belief, Mr. Rygula started in the techcomm group writing technical documentation (how everything works, user manuals) then became a product manager. Upon information and belief, Mr. Rygula left the Business Unit in or around 2002 to become a technical writer for Starent. Upon information and belief, Mr. Rygula held the same or a similar position both at the Business Unit and at Starent. Upon information and belief, while at the Business Unit, Mr. Rygula had access to and did acquire Confidential and Proprietary Information, including all of the Business Unit's marketing materials and was familiar with the detailed technical aspects, strengths, weaknesses, pricing, performance and features of its products.

70.     Upon information and belief, the co-founder of Starent, Mr. Anthony P. Schoener, was a former Director of Software Development for 3Com Corp.  Upon information and belief, Mr. Schoener left 3Com Corp. in or around June 2000 and helped form Starent shortly thereafter. Upon information and belief, Mr. Schoener is Starent's Vice President of Engineering.

71.     Upon information and belief, Mr. Janakiraman Senthilnathan had access to and did acquire Confidential and Proprietary Information, of the Business Unit and left the Business Unit in October 2000. Mr. Senthilnathan was an engineer in RAS who worked with Messrs. Puthiyandyil and Ramankutty. Upon information and belief, Mr. Senthilnathan held the same or similar positions at both the Business Unit and Starent. Upon information and belief, the technology of the Business Unit's RAS group is the same or similar to that used by Starent.

72.     Upon information and belief, Mr. Shieh was a principal architect and product manager for the Business Unit. Upon information and belief, Mr. Shieh left the Business Unit in or around January 2001 to become General Manager of Greater China

16

and Vice President of Technology Development for Starent. Upon information and belief, Mr. Shieh held the same or a similar position at both the Business Unit and Starent. Upon information and belief, while at the Business Unit, Mr. Shieh had access to and did acquire Confidential and Proprietary Information, including the Business Unit's marketing materials and customer information and was familiar with the strengths, weaknesses, pricing, performance and features of its products. Upon information and belief, while at the Business Unit, Mr. Shieh maintained the Business Unit's confidential and proprietary customer contacts with China Unicom and then used those same contacts for the benefit of Starent.

73.     Upon information and belief, Mr. Sirota, who was the Director of Wireless Product Management, left the Business Unit in or around November 2000 to become Starent's Vice President of Product Management. Upon information and belief, Mr. Sirota held the same or a similar position both at the Business Unit and at Starent. Upon information and belief, while at the Business Unit, Mr. Sirota worked with the PDSN products and had access to and did acquire Confidential and Proprietary Information, including detailed information about the PDSN products, as well as the source code. Upon information and belief, while at the Business Unit, Mr. Sirota also had access to and did acquire additional Confidential and Proprietary Information including all of the Business Unit's marketing materials and customer information and was familiar with the detailed technical aspects, strengths, weaknesses, pricing, performance and features of its products.

74.     Upon information and belief, Mr. Grant Taylor was a platform software engineer for the Business Unit and had access to and did acquire Confidential and Proprietary Information until October 2000 when he left to become a principal software engineer for Starent. Upon information and belief, Mr. Taylor held the same or a similar position at both the Business Unit and Starent. Upon information and belief, while at Starent Mr. Taylor has designed and implemented software for the ST Products.

75.    Upon information and belief, Mr. Tiwari was a director of product management for the Business Unit and had access to and did acquire Confidential and Proprietary Information. Upon information and belief, Mr. Tiwari left the Business Unit in or around 2002 and is now Vice President Solutions Development for Starent. Upon information and belief, Mr. Tiwari held the same or similar positions at both the Business Unit and Starent. Upon information and belief, while at the Business Unit, Mr. Tiwari was a director for the RAS group. Upon information and belief, the technology of the RAS group is the same or similar to that used by Starent.

76.    Upon information and belief, Mr. Wininger was the head of proposals at the Business Unit and had access to and did acquire Confidential and Proprietary Information. Upon information and belief, while at the Business Unit, Mr. Wininger wrote and responded to all the requests for proposals ("RFPs"). Upon information and belief, Mr. Wininger left the Business Unit in or around 2001 to work on RFPs at Starent. Upon information and belief, Mr. Wininger held the same or a similar position both at the Business Unit and at Starent. Upon information and belief, while at the Business Unit, Mr. Wininger had access to and did acquire Confidential and Proprietary Information including all of the Business Unit's responses to RFPs, marketing materials and customer information and was familiar with the technical aspects, strengths, weaknesses, pricing, performance and features of its products. Upon information and belief, Mr. Wininger is no longer working for Starent.

77.    Upon information and belief, Mr. Zarich worked in sales for the Business Unit. Upon information and belief, Mr. Zarich left the Business Unit in or around November 2002 to work in sales for Starent. Upon information and belief, Mr. Zarich left the Business Unit on the very same day with one of his co-workers, Mr. Gabel, who also left the Business Unit for Starent. Upon information and belief, Mr. Zarich held the same or a similar position both at the Business Unit and at Starent. Upon information and belief, while at the Business Unit, Mr. Zarich worked on the Sprint account and then

worked on the same account for Starent. Upon information and belief, while at the Business Unit, Mr. Zarich had access to and did acquire Confidential and Proprietary Information including all of the Business Unit's marketing materials and customer information and was familiar with the detailed technical aspects, strengths, weaknesses, pricing, performance and features of its products. Upon information and belief, Mr. Zarich no longer works for Starent.

**Starent's Use of UTSI's Proprietary Technology**

78.    Upon information and belief, Starent has engaged in a pattern of improperly and unlawfully acquiring, copying and/or using UTSI's Confidential and Proprietary Information and other intellectual property.

79.    Upon information and belief, the invention disclosed in Starent's patent application entitled "Reduced data session establishment time in CDMA-2000 networks," document number 20050204043 is owned by UTSI. It was invented by former employees Mr. Harper, Mr. Puthiyandyil and Mr. Senthilnathan while they were employees of the Business Unit and implemented by UTSI in its products more than one year prior to Starent's filing of this patent application.

80.    Upon information and belief, the invention disclosed in Starent's patent application entitled "Method and system for traffic redirection for prepaid subscriber sessions in a wireless network," document number 20060276170 is owned by UTSI. It was invented by former employee Mr. Radhakrishnan and another individual while Mr. Radhakrihnan was an employee of the Business Unit, and it is taught by UTSI's implementation of prepaid subscriber services, already patented in UTSI's patent, United States Patent No. 6,829,473 and related patent applications.

81.    Upon information and belief, the invention disclosed in Starent's patent application entitled "Managing resources for IP networks," document number 20040250159 is owned by UTSI. It was invented by former employee Mr. Harper and two other individuals while Mr. Harper was an employee of the Business Unit. The

invention, is taught by UTSI's implementation of software replication in UTSI's patent, United States patent No. 6,560, 217, which was also invented by former employee Mr. Harper and former employee Mr. Mortsolf, along with three other individuals.

82.     Upon information and belief, the invention disclosed in Starent's patent, United States Patent No. 6,985,464, entitled "Managing packet data interconnections in mobile communications" is owned by UTSI. It was invented by former employees Mr. Harper and Mr. Senthilnathan while employees of the Business Unit. The invention is taught by UTSI's implementation of managing foreign agent selections that is already patented in UTSI's patent, United States Patent No. 7,193,985. Starent filed its patent only approximately six weeks after UTSI. Further, Mr. Sirota, now an employee of Starent, was the Business Unit employee that signed off on the invention disclosure (an internal Business Unit document) for the Business Unit.

**UTSI's Patents**

83.     On February 6, 2007, the United States Patent and Trademark Office (the "USPTO") duly and legally issued United States Patent No. 7,173,905 ("the '905 patent"), entitled "PDSN fast tunnel lookup." A copy of the '905 patent is attached hereto as Exhibit A.

84.     On December 20, 2005, the USPTO duly and legally issued United States Patent No. 6,978,128 ("the '128 patent"), entitled "System and method to allow simple IP mobile nodes to operate seamlessly in a mobile IP network with true roaming capabilities." A copy of the '128 patent is attached hereto as Exhibit B.

85.     On November 8, 2005, the USPTO duly and legally issued United States Patent No. 6,963,582 ("the '582 patent"), entitled "Applying modified mobile internet protocol (IP) in a wireless mobile data network interface." A copy of the '582 patent is attached hereto as Exhibit C.

86.     On July 20, 2004, the USPTO duly and legally issued United States Patent No. 6,765,900 ("the '900 patent"), entitled "Virtual home agent service using software-

20

replicated home agents." Starent employees Mr. Harper and Mr. Mortsolf (along with here other individuals) are listed as the inventors of the '900 patent. A copy of the '900 patent is attached hereto as Exhibit D.

87.    On January 27, 2004, the USPTO duly and legally issued United States Patent No. 6,684,256 ("the '256 patent"), entitled "Routing method for mobile wireless nodes having overlapping internet protocol home addresses." A copy of the '256 patent is attached hereto as Exhibit E.

88.    UTSI is the owner of and currently owns all right, title and interest in the '905, '128, '582, '900 and '256 patents, including the right to sue and collect damages for all prior, current and future infringements.

## COUNT 1
## VIOLATION OF THE ILLINOIS TRADE SECRET ACT
### (Against All Defendants)

89.    UTSI repeats and realleges Paragraphs 1 through 88 of this Complaint as if fully set forth herein.

90.    The Confidential and Proprietary Information described herein constitutes trade secrets under the Illinois Trade Secrets Act, 765 ILCS 1065/1 et seq. ("the Act").

91.    The defendants removed, used and/or disclosed the trade secret information belonging to UTSI.    The defendants' actions, as alleged herein, constitute misappropriation of UTSI's trade secrets under the Act. The defendants' actions, as alleged herein, also constitute a continuing threat of misappropriation.

92.    Starent has used and/or is likely to use trade secret information belonging to UTSI. Starent's actions constitute a misappropriation of trade secrets under the act. Starent's actions, as alleged herein, also constitute a continuing threat of misappropriation.

93.    Section 3 of the Act authorizes the issuance of an injunction in the event of an actual or threatened misappropriation.

21

94.    the actions of Defendants, as alleged herein, in connection with UTSI's trade secrets have been and will continue to be willful.

95.    Defendants' continued breaches of the Act have caused and will continue to cause UTSI to lose business, and the goodwill, reputation, and confidence of the 3G wireless industry, none of which could have been compensated by money damages, thereby causing UTSI to sustain irreparable harm.

## COUNT 2
## PATENT INFRINGEMENT
## U.S. PATENT NO. 7,173,905
### (Against Starent)

96.    UTSI repeats and realleges Paragraphs 1 through 95 of this Complaint as if fully set forth herein.

97.    The '905 patent is entitled to a presumption of validity.

98.    Upon information and belief, Starent has infringed and is still infringing, and/or is actively inducing or contributing to the infringement by Starent's customers in violation of 35 U.S.C. §§ 271(a), (b) and/or (c) one or more claims of the '905 patent by making, using, operating, offering for sale and/or selling within the United States the ST Products which infringe one or more claims of the '905 patent.

99.    Upon information and belief, Starent's infringement of the '905 patent has been and continues to be willful and deliberate and with the full knowledge of the '905 patent.

100.    Upon information and belief, Starent will continue its infringing activities unless enjoined by the Court.

101.    As a result of Starent's infringement, UTSI has suffered and continues to suffer damages in an amount to be proven at trial.

## COUNT 3
## PATENT INFRINGEMENT
## U.S. PATENT NO. 6,978,128
### (Against Starent)

102.    UTSI repeats and realleges Paragraphs 1through 101 of this Complaint as if fully set forth herein.

103.    The '128 patent is entitled to a presumption of validity.

104.    Upon information and belief, Starent has infringed and is still infringing, and/or is actively inducing or contributing to the infringement by Starent's customers in violation of 35 U.S.C. §§ 271(a), (b) and/or (c) one or more claims of the '128 patent by making, using, operating, offering for sale and/or selling within the United States the ST Products which infringe one or more claims of the '128 patent.

105.    Upon information and belief, Starent's infringement of the '128 patent has been and continues to be willful and deliberate and with the full knowledge of the '128 patent.

106.    Upon information and belief, Starent will continue its infringing activities unless enjoined by the Court.

107.    As a result of Starent's infringement, UTSI has suffered and continues to suffer damages in an amount to be proven at trial.

## COUNT 4
## PATENT INFRINGEMENT
## U.S. PATENT NO. 6,963,582
### (Against Starent)

108.    UTSI repeats and realleges Paragraphs 1 through 107 of this Complaint as if fully set forth herein.

109.    The '582 patent is entitled to a presumption of validity.

110.    Upon information and belief, Starent has infringed and is still infringing, and/or is actively inducing or contributing to the infringement by Starent's customers in

violation of 35 U.S.C. §§ 271(a), (b) and/or (c) one or more claims of the '582 patent by making, using, operating, offering for sale and/or selling within the United States the ST Products which infringe one or more claims of the '582 patent.

111.    Upon information and belief, Starent's infringement of the '582 patent has been and continues to be willful and deliberate and with the full knowledge of the '582 patent.

112.    Upon information and belief, Starent will continue its infringing activities unless enjoined by the Court.

113.    As a result of Starent's infringement, UTSI has suffered and continues to suffer damages in an amount to be proven at trial.

<div align="center">

**COUNT 5**
**PATENT INFRINGEMENT**
**U.S. PATENT NO. 6,765,900**
**(Against Starent)**

</div>

114.    UTSI repeats and realleges Paragraphs 1 through 113 of this Complaint as if fully set forth herein.

115.    The '900 patent is entitled to a presumption of validity.

116.    Upon information and belief, Starent has infringed and is still infringing, and/or is actively inducing or contributing to the infringement by Starent's customers in violation of 35 U.S.C. §§ 271(a), (b) and/or (c) one or more claims of the '900 patent by making, using, operating, offering for sale and/or selling within the United States the ST Products which infringe one or more claims of the '900 patent.

117.    Upon information and belief, Starent's infringement of the '900 patent has been and continues to be willful and deliberate and with the full knowledge of the '900 patent.

118.    Upon information and belief, Starent will continue its infringing activities unless enjoined by the Court.

119.   As a result of Starent's infringement, UTSI has suffered and continues to suffer damages in an amount to be proven at trial.

### COUNT 6
### PATENT INFRINGEMENT
### U.S. PATENT NO. 6,684,256
**(Against Starent)**

120.   UTSI repeats and realleges Paragraphs 1 through 119 of this Complaint as if fully set forth herein.

121.   The '256 patent is entitled to a presumption of validity.

122.   Upon information and belief, Starent has infringed and is still infringing, and/or is actively inducing or contributing to the infringement by Starent's customers in violation of 35 U.S.C. §§ 271(a), (b) and/or (c) one or more claims of the '256 patent by making, using, operating, offering for sale and/or selling within the United States the ST Products which infringe one or more claims of the '256 patent.

123.   Upon information and belief, Starent's infringement of the '256 patent has been and continues to be willful and deliberate and with the full knowledge of the '256 patent.

124.   Upon information and belief, Starent will continue its infringing activities unless enjoined by the Court.

125.   As a result of Starent's infringement, UTSI has suffered and continues to suffer damages in an amount to be proven at trial.

### COUNT 7
### INTENTIONAL INTERFERENCE WITH BUSINESS RELATIONS AND
### PROSPECTIVE ECONOMIC ADVANTAGE
**(Against All Defendants)**

126.   UTSI repeats and realleges Paragraphs 1 through 125 of this Complaint as if fully set forth herein.

127.    Based upon UTSI's well-established relationships with Sprint and Verizon and its prior dealings with Sprint and Verizon, UTSI had a reasonable expectancy of continuing its existing relationships with Sprint and Verizon and entering into additional agreements and business arrangements with Sprint and Verizon.

128.    Defendants knew of UTSI's existing relationships with Sprint and Verizon and its other customers, and knew or should have known of UTSI's expectancy of entering into additional agreements and business arrangements with Sprint and Verizon and its other customers.  Defendants also knew or should have known of UTSI's prior dealing with Sprint and Verizon, knew that Sprint and Verizon had long-standing relationships with UTSI, and that UTSI had a reasonable expectancy of continuing its existing relationships with Sprint and Verizon and entering into additional agreements and business arrangements with Sprint and Verizon.

129.    By soliciting a relationship with Sprint and Verizon and competing against UTSI using Confidential and Proprietary Information, Defendants intentionally and without justification interfered with UTSI's expectancy of continuing its existing relationships with Sprint and Verizon and entering into additional agreements and business arrangements with Sprint and Verizon.

130.    Defendants' conduct was willful, wanton and reckless and undertaken with callous disregard and indifference to UTSI's relationships with Sprint and Verizon. Defendants calculated to harm UTSI's business and conceal their activities in order to increase the likelihood of damages to UTSI.

131.    UTSI has been damaged by the defendants' intentional interference with its existing business relationships and prospective economic advantage from lost relationships.  UTSI's business relationships with Sprint and Verizon have been serious and likely irretrievably harmed.

26

**COUNT 8**
**DECLARATIONS OF OWNERSHIP**
**(Against Starent)**

132.   UTSI repeats and realleges Paragraphs 1 through 131 of this Complaint as if fully set forth herein.

133.   Starent's patent application document number 20050204043, invented by former employees Mr. Harper, Mr. Puthiyandyil and Mr. Senthilnathan, was implemented by UTSI in its products more than one year prior to Starent's filing of this application.

134.   Starent intentionally disclosed UTSI's valuable trade secrets by filing the 20050204043 patent application.

135.   Continued prosecution of the 20050204043 patent application is likely to cause further disclosure of UTSI's trade secrets.

136.   Accordingly, Starent should be enjoined from further prosecution of the 20050204043 patent application and all rights therein should be assigned to UTSI.

137.   Starent's patent application document number 20060276170, invented by former employee Mr. Radhakrishnan and another individual, is taught by UTSI's implementation of prepaid subscriber services that is already patented by UTSI.

138.   To the extent that the 20060276170 patent application contains any patentable inventions, such inventions were conceived while Mr. Radhakrishnan was an employee of UTSI (the Business Unit).

139.   Accordingly, all rights in the 20060276170 patent application should be assigned to UTSI.

140.   Starent's patent application document number 20040250159, invented by former employee Mr. Harper and two other individuals, is taught by UTSI's implementation of software replication that is already patented by UTSI (through inventions also by former employee Mr. Harper and former employee Mr. Mortsolf, along with three other individuals).

27

141. To the extent that the 20040250159 patent application contains any patentable inventions, such inventions were conceived while Mr. Harper was an employee of UTSI (the Business Unit).

142. Accordingly, all rights in the 20040250159 patent application should be assigned to UTSI.

143. Starent's patent, United States Patent No. 6,985,464 ("the '464 patent"), invented by former employees Mr. Harper and Mr. Senthilnathan, is taught by UTSI's implementation of managing foreign agent selections that is already patented by UTSI.

144. To the extent that there are any patentable improvements in the '464 patent, such patentable improvements were conceived and known to Mr. Harper and Mr. Senthilnathan while they were still employees of UTSI (the Business Unit).

145. Accordingly, all rights in the '464 patent should be assigned to UTSI.

### REQUEST FOR RELIEF

WHEREFORE, Plaintiff UTSI respectfully requests that the Court enter judgment as follows:

A.    A finding that Defendants have misappropriated UTSI's trade secrets and other confidential information;

B.    An order for an injunction against the individual defendants restraining them from soliciting, accepting or performing services for or providing goods to any person or entity that was a customer or potential customer of UTSI at the time of their employment with UTSI;

C.    An order for an injunction against Defendants restraining them from the use, further misappropriation or disclosure of UTSI's trade secrets or other confidential information;

D.    An order for an accounting of the business activities of Starent to determine the sums by which it has been unjustly enriched;

28

E.    An award of damages in an amount equal to the losses that UTSI suffered as a result of Defendants' unlawful acts;

F.    An award of punitive damages for Defendants' wanton, reckless conduct;

G.    A finding that Starent has infringed each of the '905, '128, '582, '900 and '256 patents either directly, contributorily and/or by inducement;

H.    A finding that Starent's infringement has been willful and deliberate;

I.    An order that Starent provide UTSI an accounting for all infringements;

J.    An award of damages adequate to compensate UTSI for Starent's infringements of each of the '905, '128, '582, '900 and '256 patents, in an amount to be determined at trial, but in no event less than a reasonable royalty;

K.    An award of enhanced damages, in the form of treble damages, pursuant to 35 U.S.C. § 284, for Starent's willful and deliberate infringements;

L.    A finding that this is an exceptional case under 35 U.S.C. § 285, and an award to UTSI of its reasonable attorneys' fees, expenses and costs incurred in this action, including for all appeals;

M.    An award of prejudgment and post judgment interest on the damages and costs caused to UTSI by reason of Starent's infringements, including prejudgment and post judgment interest on any enhanced damages, attorneys' fees, expenses and costs award, pursuant to 35 U.S.C. § 284;

N.    An order preliminarily and permanently enjoining Starent, its agents, employees, representatives, successors and assigns, and those acting in privity or concert with such persons and/or entities from infringing the '905, '128, '582, '900 and '256 patents;

O.    An order for an injunction against Starent restraining further prosecution of the 20050204043 patent application;

P.    A declaration of ownership of the 20050204043 patent application and an order for an assignment of all rights therein to UTSI;

29

Q.    A declaration of ownership of the 20060276170 patent application and an order for an assignment of all rights therein to UTSI;

R.    A declaration of ownership of the 20040250159 patent application and an order for an assignment of all rights therein to UTSI;

S.    A declaration of ownership of the '464 patent and an order for an assignment of all rights therein to UTSI; and

T.    For any and all other relief that this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff UTStarcom, Inc. hereby demands a trial by jury in this action on all claims and issues triable before a jury.

Dated: May 8, 2007                    Respectfully Submitted,

JoAnna M. Esty
(Illinois Trial Bar No. 6224452)
VENABLE LLP
2049 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 229-9900
Facsimile: (310) 229-9901
jesty@venable.com

Marina N. Saito
Steven Lubezny
Loeb & Loeb LLP
321 North Clark Street
Chicago, Illinois 60610
Telephone: (312) 464-3100
Facsimile: (312) 464- 3111
msaito@loeb.com
slubezny@loeb.com

Attorneys for Plaintiff UTStarcom, Inc.

Exhibit A

US007173905B1

(12) **United States Patent**
Alex et al.

(10) **Patent No.:    US 7,173,905 B1**
(45) **Date of Patent:    Feb. 6, 2007**

(54) **PDSN FAST TUNNEL LOOKUP**

(75) Inventors: **Arun C. Alex**, Schaumburg, IL (US); **Chandra Warrier**, Schaumburg, IL (US)

(73) Assignee: **UTStarcom, Inc.**, Alameda, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 671 days.

(21) Appl. No.: **09/920,980**

(22) Filed: **Aug. 2, 2001**

(51) Int. Cl.
*H04L 12/28*    (2006.01)

(52) U.S. Cl. ...................... 370/230; 370/331; 370/338; 370/353; 370/389; 370/401

(58) **Field of Classification Search** ............... 370/230, 370/331, 338, 353, 401, 389; 709/202
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 6,434,134 B1 * | 8/2002 | La Porta et al. ............ | 370/338 |
| 6,452,920 B1 * | 9/2002 | Comstock .................... | 370/349 |
| 6,466,964 B1 * | 10/2002 | Leung et al. ................ | 709/202 |
| 6,522,880 B1 * | 2/2003 | Verma et al. ................ | 455/436 |
| 6,608,832 B2 * | 8/2003 | Forslow ...................... | 370/353 |
| 6,621,810 B1 * | 9/2003 | Leung ......................... | 370/338 |
| 6,665,537 B1 * | 12/2003 | Lioy ........................... | 455/435.1 |
| 6,701,361 B1 * | 3/2004 | Meier ......................... | 709/224 |
| 6,707,809 B1 * | 3/2004 | Warrier et al. .............. | 370/351 |
| 6,760,444 B1 * | 7/2004 | Leung ......................... | 380/270 |
| 6,856,624 B2 * | 2/2005 | Magret ........................ | 370/392 |
| 6,862,622 B2 * | 3/2005 | Jorgensen .................... | 709/226 |
| 6,894,994 B1 * | 5/2005 | Grob et al. .................. | 370/335 |
| 6,954,790 B2 * | 10/2005 | Forslow ...................... | 709/227 |
| 6,963,582 B1 * | 11/2005 | Xu ............................. | 370/466 |
| 6,985,464 B2 * | 1/2006 | Harper et al. ............... | 370/331 |
| 6,999,435 B2 * | 2/2006 | Perras ........................ | 370/331 |
| 2002/0021681 A1 * | 2/2002 | Madour ....................... | 370/331 |
| 2002/0066036 A1 * | 5/2002 | Makineni et al. ........... | 713/201 |
| 2002/0145993 A1 * | 10/2002 | Chowdhury et al. ........ | 370/338 |
| 2002/0154642 A1 * | 10/2002 | Hagirahim et al. ......... | 370/401 |
| 2003/0021252 A1 * | 1/2003 | Harper et al. ............... | 370/338 |

OTHER PUBLICATIONS

RFC 2344: May 1998: Reverse Tunneling for Mobile IP; G. Montenegro, Editor.*
RFC 2784: Mar 2000: Generic Routing Encapsulation (GRE): D. Farinacci et al.*
RFC 2661—Layer Two Tunneling Protocol "L2TP": W. Townsley et al.*
G. Montenegro, "Reverse Tunneling for Mobile IP, Revised", Network Working Group, RFC 3024, Jan. 2001, pp. 1-30.
C. Perkins, "IP Mobility Support", Network Working Group, RFC 2002, Oct. 1996, pp. 1-79.

* cited by examiner

*Primary Examiner*—Hassan Kizou
*Assistant Examiner*—Jay P. Patel
(74) *Attorney, Agent, or Firm*—UTStarcom, Inc.

(57)    **ABSTRACT**

A connection with a mobile node is established. A registration request is received and a tunnel identifier determined. The tunnel identifier is independent of (i) a home address of the mobile node and (ii) an address of a home agent for the mobile node. The registration request is transmitted to the home agent, and the registration request includes the tunnel identifier. A response to the request is received and, responsively, a connection is activated. Data packets are received from the home agent in response to transmitting the registration request. The data packets include the tunnel identifier. The connection is identified using the tunnel identifier and the packets are routed along the connection.

16 Claims, 5 Drawing Sheets



**FIGURE 1**





**FIGURE 2**



FIGURE 3

# FIGURE 4



# FIGURE 5



BEGIN

RECEIVE PACKET STREAM FROM HOME AGENT — 502

EXAMINE KEY FIELD AND OBTAIN IDENTIFIER — 504

FORWARD PACKET STREAM TO MOBILE NODE — 506

END

# FIGURE 6



BEGIN

RECEIVE PACKET STREAM FROM MOBILE NODE — 602

ATTACH KEY FIELD AND TUNNEL TO HOME AGENT — 604

EXAMINE KEY AND DETUNNEL AT HOME AGENT — 606

END

US 7,173,905 B1

**1**

## PDSN FAST TUNNEL LOOKUP

### FIELD OF THE INVENTION

This present invention relates to the routing of messages across networks. More specifically, it relates to routing data messages through tunnels quickly and efficiently.

### BACKGROUND OF THE INVENTION

Computer networks have become widely used in society today. Mobile nodes, for example, cellular telephones, are often used in conjunction with these networks. User devices, such as computers, may be connected to mobile nodes. In this way, the user device (e.g., the computer) may be in direct communication with some or all of the networks and other devices connected to these networks.

As mobile nodes move between networks, the ability to locate and communicate with the mobile node is preferably maintained. For instance, the mobile node may be assigned a home network. The home network may include a home agent. The mobile node may move to other networks ("foreign networks") that are not the home network. As the mobile node moves to these foreign networks it may register a care-of-address with the home network and the home agent in the home network. The mobile node also may register this care-of-address with a foreign agent on the foreign network. In this way, messages can be transmitted from a device in any network to the mobile node, no matter where the mobile node is located. Also, the mobile node (and user devices coupled to the mobile node) may transmit messages to the home network and receive messages from the home network.

A tunnel may be used to transmit the information from the tunnel endpoints. In tunneling, packets or frames from one network are placed inside frames ("encapsulated") of another network. The encapsulated frames may include a header with sufficient routing information to transmit the encapsulated frame from a source to a destination. In one example of tunneling, the home agent may tunnel data to the mobile node when the mobile node is on a foreign network. In another example of tunneling, a tunnel may be established between the foreign agent and the home agent to transmit data between the mobile node and the home agent when the mobile node is attached to a foreign network. Once the encapsulated frames reach the tunnel endpoint, they are unencapulated and transmitted to the ultimate destination.

### SUMMARY OF THE INVENTION

The system and method of the present invention advantageously allows the fast and efficient transfer of information through a tunnel. Specifically, the system and method of the present invention allows the quick and efficient transfer of this information through a tunnel using a tunnel identifier.

In one example of the present invention, a device may establish a connection with a mobile node. The device may receive a registration request. After receiving the registration request, the device may determine a tunnel identifier. The device may transmit the registration request to a home agent and the registration request may include the tunnel identifier.

The device may receive a response to the request and, responsively, activate a connection. The device may receive data packets from the home agent in response to transmitting the registration request, and the data packets may include the tunnel identifier. The device may identify the connection using the tunnel identifier and route the packets along the connection.

**2**

In another example of the present invention, a mobile node is coupled to a packet data-switching node (PDSN). The PDSN is coupled to a home network and the home network includes the home agent of the mobile node.

The PDSN may receive a registration request from a mobile node and the PDSN may assign a tunnel identifier to a plurality of packets associated with the registration request and received from the mobile node.

The home agent may receive and store the tunnel identifier in the registration request and send return packets to the PDSN including the tunnel identifier. The PDSN may receive a response message from the home agent and establish a connection between the mobile node and the home agent. The PDSN may extract the tunnel identifier from the return packets and translate the tunnel identifier into information representative of the connection. The PDSN may transmit the return packets on the connection.

These as well as other features and advantages of the present invention will become apparent to those of ordinary skill in the art by reading the following detailed description, with appropriate reference to the accompanying drawings.

### BRIEF DESCRIPTION OF THE DRAWINGS

Preferred embodiments of the present inventions are described with reference to the following drawings, wherein:

FIG. 1 is a diagram illustrating a preferred embodiment of the system for fast tunnel lookup in accordance with the present invention;

FIG. 2 is a diagram illustrating a call-flow diagram for performing fast tunnel look-up in accordance with a preferred embodiment of the present invention;

FIG. 3 is a diagram illustrating one example of a PDSN in accordance with a preferred embodiment of the present invention;

FIG. 4 is a flowchart of one example of the operation of a PDSN in accordance with a preferred embodiment of the present invention;

FIG. 5 is a flowchart of one example of the operation of a PDSN in accordance with a preferred embodiment of the present invention; and

FIG. 6 is a flowchart of one example of the operation of a PDSN in accordance with a preferred embodiment of the present invention.

### DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

Referring to FIG. 1, a system includes a mobile node 102, a radio network 104, a packet data-switching node (PDSN) 106, and a home network 108. The mobile node 102 is coupled to the radio network 104. The radio network 104 is coupled to the PDSN 106. The PDSN 106 is coupled to home network 108.

The mobile node 102 may be any type of device capable of communicating with a wireless network. For example, the mobile node 102 may be a cellular telephone, a personal digital assistant (PDA), or a computer. Other examples of mobile nodes are possible. In addition, the mobile node 102 may be a combination of devices where one or more devices in the combination is capable of maintaining communications with a wireless network. For example, a personal computer may be coupled to a cellular telephone and the cellular telephone may be coupled to the radio network. Other examples of combinations of devices and networks are possible.

US 7,173,905 B1

3

The radio network 104 may be any type of network that locates and facilitates communications with mobile wireless devices. For example, the radio network 104 may be a cellular telephone network and may include base stations, switches, and gateways. The radio network 104 may include other devices, as well. In addition, the radio network 104 may be any combination of suitable networks where the networks are coupled together.

The functions of the PDSN 106 may be implemented by computer instructions stored in a memory and executed by a processor. The PDSN 106 may perform foreign agent functionality. For example, the PDSN may forward a care-of-address to the home agent of the mobile node. In addition, the PDSN 106 may initiate authentication, authorization, and accounting functions for the mobile client.

The PDSN 106 may create a unique identifier for a call and transmit the unique identifier to the home agent. The PDSN 106 may receive a response from the home agent and establish a connection between the home agent and the mobile node. The PDSN 106 may also receive information from the home agent and the information may be associated with a particular identifier. The PDSN may extract this identifier from the information, translate the identifier into connection information, and forward the information along the connection having the determined connection information.

The PDSN 106 may include a memory. The memory may include a plurality of tables to establish the connection. For example, the memory may include a tunnel table. The tunnel table may have entries that are indexed by identifiers. The entries in the tunnel table may point to a connection table. The connection table may have entries that specify a connection.

The tunnel table may be populated when the PDSN 106 assigns an identifier to a particular call, for example. The connection table may be populated when the connection is made between the mobile and the home agent, for instance. Other examples of data structures may also be used.

The home network 108 may be any type of network. For example, it may be the Internet, a local area network (LAN), or a wireless network. In addition, the home network 108 may be any combination of networks that use any combination of technology.

In one example of the operation of the system shown in FIG. 1, the mobile node 102 may send a registration request to the PDSN 106. The PDSN 106 may receive the request and assign a tunnel identifier to the call represented by the request. The PDSN 106 may attach the tunnel identifier to the request and forward the request to the home agent 108. The PDSN 106 may also add an entry to the tunnel table indicating the tunnel identifier with an associated entry pointing to an entry in the connection table. At this point, this entry is empty.

The home agent 108 may receive the request and issue a response. The response may be sent by the home agent 108 to the PDSN 106. The PDSN 106 may forward the response to the mobile node 102. The PDSN 106 may then establish a session between the mobile node 102 and the home agent 108. The session may include connection information, which uniquely identifies and specifies the connection. The PDSN 106 may then add this entry to the connection table and fill in the empty entry in the tunnel table, such that this entry points to the new entry in the connection table.

Subsequently, the home agent 108 may send packets of information with the tunnel identifier to the PDSN 106. The PDSN 106 may receive the packets and extract the tunnel identifier. The PDSN 106 may use the tunnel identifier to

4

find an entry in the tunnel table indexed by the tunnel identifier. The entry in the tunnel table may point to an entry in the connection table. The PDSN 106 may then route the packets on the specified connection.

Referring to FIG. 2, a call flow diagram illustrating one example of the interaction between a mobile node, PDSN, and home agent is described. The diagram describes one example of communication between the mobile node, PDSN, and home network (with the home agent of the mobile node).

At step 202, a point-to-point (PPP) connection is established between the mobile node and the PDSN. For example, the PDSN and the mobile node may exchange PPP control information to establish a link. This interchange may include an authentication phase wherein the mobile node is authenticated. Subsequent to the authentication phase an IP address negotiation phase follows during which an IP address is assigned to the mobile node for it to establish IP communication with the home network. Other steps may also be included.

At step 204, a registration request is sent from the mobile node to the PDSN. The registration request may include the IP address assigned to the mobile during the PPP phase, the IP address of the PDSN and the IP tunneling scheme that it wishes to use (for example, Generic Routing Encapsulation (GRE)), the IP address of the home agent, and authentication information using which the home agent can authenticate the mobile node. Other types of information may also be included in the registration request.

At step 206, the PDSN attaches a vendor-specific extension for the key, for example, a GRE key, before the registration request is sent to the home agent. The vendor-specific extension may indicate the tunnel identifier.

At step 208, the registration request is transmitted from the PDSN to the home agent. The PDSN may also assign a tunnel identifier to the call.

At step 210, the home agent saves the tunnel identifier and sends a registration response to the PDSN. The registration response may include the IP address of the mobile, the IP address of the home agent and authentication information using which the mobile node can authenticate the home agent. The registration response may include other types of information, as well. The home agent may fill a field in the header (e.g., the key field in a header) with the tunnel identifier and sends the data packets to the PDSN.

At step 212, the PDSN removes vendor-specific extensions for the GRE key before re-transmitting the registration response. For example, the PDSN may only remove the vendor-specific information for the key and any other information that was not sent by the mobile node in the original request.

At step 214, the PDSN transmits the registration response to the mobile node. The registration response may have the vendor-specific information removed. The PDSN uses the key (e.g., the GRE key) to do a direct look-up of the appropriate tunnel to the mobile node.

At step 216, a tunnel is established between the mobile and the PDSN.

At step 218, a tunnel is established between the PDSN and the home agent. The header may use the key previously exchanged during registration.

Referring to FIG. 3, one example of a PDSN 300 includes a PPP connection table 302, a tunnel table 304, and a processor 306. The PPP connection table 302 may include an entry 308 and the tunnel table 304 may include an entry 310. A link 312 may couple the PDSN 300 to a radio network. A link 316 may couple the PDSN to a home network. A packet

US 7,173,905 B1

5

318 may be transmitted from the home network to the PDSN 300 via the link 316. The packet may include a header portion 320 and a data portion 322. The header portion may have a key entry 324.

The processor 306 may be any type of processor capable of processing computer instructions stored in a memory. In addition, the processor may be any combination of hardware or software used to implement any or all of the functions of the PDSN.

A packet 318 may be any entity used to transmit or carry any type of information. The header portion 320 includes the key field 324. The contents of the key field 324 may be a tunnel identifier. For example, the tunnel identifier may be an integer value. The header 320 may include other types of information, for example, error detection information.

The tunnel table 304 may include a plurality of entries. Each of the entries may point to an entry in the PPP connection table 302. For example, the entry 310 may be a pointer to a location in the PPP connection table 302. The tunnel table 304 may be created at system start-up. Entries in the tunnel table 304 may be added when tunnel identifiers are assigned. The entries (indexed by the tunnel identifiers) may be made whenever connection information becomes available.

The PPP connection table 302 may include a plurality of entries. The entries may specify a particular connection. For example, the entry 308 may include link information for the PPP interface, for example, the IP address of the mobile, the radio node associated with this mobile node and other link specific information. The PPP connection table 302 may be created at system start-up. The entries in the connection table are pointed to by entries in the tunnel table 304. The entries in the PPP connection table 302 may be filled in when connection information becomes available.

Referring now to FIG. 4, one aspect of the operation of the PDSN is described. Specifically, FIG. 4 describes one example of setting up a call. At step 400, the PDSN receives a mobile IP registration request. In one example, the mobile IP registration request may be in the form of a UDP packet. Other examples of mobile IP registration requests are possible.

At step 404, the PDSN assigns a tunnel identifier to the call. The tunnel identifier may be assigned randomly or non-randomly. The tunnel identifier may be in any form, for example, an integer. Other examples of tunnel identifiers are possible.

At step 406, the PDSN forwards the registration response to the home agent of the mobile node. The home agent of the mobile node may be indicated by the care-of-address of the mobile node, which is stored in the PDSN.

At step 408, the PDSN waits while the home agent accepts the mobile IP registration request and saves the tunnel identifier. At step 410, the PDSN receives a registration reply from the home agent. For example, the reply may be in the form of a Mobile IP registration reply. Other examples of replies are possible.

At step 412, the PDSN may activate the tunnel. For example, the PDSN may create an IP tunnel to the home agent using the GRE protocol. At step 414, the PDSN may forward the response to the mobile node.

Referring now to FIG. 5, one aspect of the operation of the PDSN is described. Specifically, FIG. 5 describes one example of how the PDSN moves data from the home agent to a mobile node.

6

At step 502, the PDSN receives a stream of packets from a home agent, for example, representing a call. The packets may be representative of any other type of information, as well.

At step 504, the PDSN examines the key field in the packet. The key field may include the tunnel identifier. The PDSN may examine the tunnel table. The tunnel table may include a tunnel table entry that corresponds to the PDSN connection table. The PDSN may obtain the connection information from the connection table. In addition, the packet may include any other field, instead of the key field, to carry the tunnel identifier.

At step 506, the PDSN forwards the packet stream to the mobile node.

Referring now to FIG. 6, one aspect of the operation of the PDSN is described. Specifically, FIG. 6 illustrates one example of how the PDSN moves data from the mobile node to the home agent.

At step 602, the PDSN receives a packet stream from a mobile node. At step 604, the PDSN determines the tunnel identifier (which may be stored), attaches the tunnel identifier to a key field, and creates a tunnel. At step 606, the home agent examines the key and detunnels at the home agent. For instance, the home agent may extract the original IP packet from the mobile node and forward it to its ultimate destination (e.g., a web server).

In view of the wide variety of embodiments to which the principles of the present invention can be applied, it should be understood that the illustrated embodiments are exemplary only, and should not be taken as limiting the scope of the present invention. For example, the steps of the flow diagrams may be taken in sequences other than those described, and more or fewer elements may be used in the block diagrams. While various elements of the preferred embodiments have been described as being implemented in software, in other embodiments in hardware or firmware implementations may alternatively be used, and vice-versa.

It will be apparent to those of ordinary skill in the art that methods involved in the system and method for fast tunnel lookup may be embodied in a computer program product that includes a computer usable medium. For example, such a computer usable medium can include a readable memory device, such as, a hard drive device, a CD-ROM, a DVD-ROM, or a computer diskette, having computer readable program code segments stored thereon. The computer readable medium can also include a communications or transmission medium, such as, a bus or a communications link, either optical, wired, or wireless having program code segments carried thereon as digital or analog data signals.

The claims should not be read as limited to the described order or elements unless stated to that effect. Therefore, all embodiments that come within the scope and spirit of the following claims and equivalents thereto are claimed as the invention.

What is claimed is:

1. A method for establishing a connection with a mobile node, the method comprising:

receiving a registration request;

determining a tunnel identifier;

transmitting the registration request to the home agent, the registration request including the tunnel identifier in a key field of a tunnel header of the registration request;

receiving a response to the request and, responsively, activating a connection;

receiving data packets from the home agent in response to transmitting the registration request, the data packets

US 7,173,905 B1

7

including the tunnel identifier in a key field of a tunnel
header of the data packets;

identifying the connection using the tunnel identifier,
wherein identifying the connection using the tunnel
identifier comprises using the tunnel identifier to iden-   5
tify an entry in a tunnel table and using the entry in the
tunnel table to identify an entry in a connection table,
wherein the tunnel table is indexed by tunnel identifi-
ers, and wherein the entry in the connection table
identifies the connection; and                          10

routing the packets along the connection.

2. A method for establishing a connection with a mobile
node, the method comprising:

receiving a registration request from a mobile node, the
mobile node having a home agent, the registration   15
request also representing a call;

assigning a tunnel identifier to the call associated with the
registration request;

forwarding the registration request to the home agent, the
registration request including the tunnel identifier in a  20
key field of a tunnel header of the registration request;

establishing a connection;

receiving a registration response and forwarding the reg-
istration response to the mobile node;

receiving packets of data from the home agent, each of the  25
packets of data including the tunnel identifier in a key
field of a tunnel header of the packet; and

subsequently, using the tunnel identifier to identify the
connection for packets having the tunnel identifier,
wherein using the tunnel identifier to identify the  30
connection for packets having the tunnel identifier
comprises using the tunnel identifier to identify an
entry in a tunnel table and using the entry in the tunnel
table to identify an entry in a connection table, wherein
the tunnel table is indexed by tunnel identifiers, and  35
wherein the entry in the connection table identifies the
connection.

3. The method of claim 2 wherein the connection infor-
mation is from the point-to-point protocol (PPP).

4. The method of claim 2 wherein each of the packets  40
includes a header and the header is a Generic Routing
Encapsulation (GRE) header.

5. A method comprising:

receiving a registration request;                       45

receiving a data stream, the data stream associated with
the registration request, the data stream including a
plurality of packets;

assigning a tunnel identifier to the data stream;

transmitting the registration request to the home agent, the  50
registration request including the tunnel identifier in a
key field of a tunnel header of the registration request;

receiving return packets of information, the return packets
of information including the tunnel identifier in a key
field of a tunnel header of the return packets; and  55

translating the tunnel identifier into a connection and
transmitting the return packets using the connection,
wherein translating the tunnel identifier into the con-
nection comprises using the tunnel identifier to identify
an entry in a tunnel table and using the entry in the  60
tunnel table to identify an entry in a connection table,
wherein the tunnel table is indexed by tunnel identifi-
ers, and wherein the entry in the connection table
identifies the connection.

6. The method of claim 5 wherein the step of translating  65
includes establishing the tunnel table, the tunnel table hav-
ing entries corresponding to tunnel identifiers.

8

7. The method of claim 6 wherein the step of translating
includes establishing the connection table, the connection
table including connection information for entries in the
tunnel table.

8. The method of claim 7 wherein the connection table
includes information according to the point-to-point proto-
col (PPP) format.

9. A system comprising:

a mobile node;

a packet data-switching node (PDSN), the PDSN com-
municatively coupled to the mobile node, the PDSN
receiving a registration request from the mobile node,
the PDSN assigning a tunnel identifier to a plurality of
packets received from the mobile node, the PDSN
further inserting the tunnel identifier in a key field of a
tunnel header of the plurality of packets;

a home agent coupled to the PDSN, the home agent
receiving and storing the tunnel identifier in the regis-
tration request and sending return packets to the PDSN
including the tunnel identifier in a key field of a tunnel
header of the return packets;

wherein the PDSN receives a response message from the
home agent and establishes a connection between the
mobile node and the home agent; and

wherein the PDSN extracts the tunnel identifier from the
return packets and translates the tunnel identifier into
information representative of the connection, and trans-
mits the return packets on the connection, wherein the
PDSN translating the tunnel identifier into information
representative of the connection comprises the PDSN
using the tunnel identifier to identify an entry in a
tunnel table and using the entry in the tunnel table to
identify an entry in a connection table, wherein the
tunnel table is indexed by tunnel identifiers, and
wherein the entry in the connection table identifies the
connection.

10. The system of claim 9 wherein the connection is made
according to the point-to-point protocol (PPP).

11. The system of claim 9 wherein the PDSN includes the
tunnel table and the connection table, and wherein the
connection table is a point-to-point protocol (PPP) connec-
tion table.

12. A system for establishing a connection with a mobile
node, the system comprising:

means for receiving a registration request;

means for determining a tunnel identifier;

means for transmitting the registration request to the
home agent, the registration request including the tun-
nel identifier in a key field of a tunnel header of the
registration request;

means for receiving a response to the request and, respon-
sively, activating a connection;

means for receiving data packets from the home agent in
response to transmitting the registration request, the
data packets including the tunnel identifier in a key
field of a tunnel header of the data packets;

means for identifying the connection using the tunnel
identifier, wherein identifying the connection using the
tunnel identifier comprises using the tunnel identifier to
identify an entry in a tunnel table and using the entry in
the tunnel table to identify an entry in a connection
table, wherein the tunnel table is indexed by tunnel
identifiers, and wherein the entry in the connection
table identifies the connection; and

means for routing the packets along the connection.

13. A system for establishing a connection with a mobile
node, the system comprising:

US 7,173,905 B1

9

means for receiving a registration request from a mobile node, the mobile node having a home agent, the registration request also representing a call;

means for assigning a tunnel identifier to the call associated with the registration request;

means for forwarding the registration request to the home agent, the registration request including the tunnel identifier in a key field of a tunnel header of the registration request;

means for establishing a connection;

means for receiving a registration response and forwarding the registration response to the mobile node;

means for receiving packets of data from the home agent, each of the packets of data including the tunnel identifier in a key field of a tunnel header of the packet; and

means for using the tunnel identifier to identify the connection for packets having the tunnel identifier, wherein using the tunnel identifier to identify the connection for packets having the tunnel identifier comprises using the tunnel identifier to identify an entry in a tunnel table and using the entry in the tunnel table to identify an entry in a connection table, wherein the tunnel table is indexed by tunnel identifiers, and wherein the entry in the connection table identifies the connection.

14. A system comprising:

means for receiving a registration request;

means for receiving a data stream, the data stream associated with the registration request, the data stream including a plurality of packets;

means for assigning a tunnel identifier to the data stream;

means for transmitting the registration request to a home agent, the registration request including the tunnel identifier in a key field of a tunnel header of the registration request;

means for receiving return packets of information, the return packets of information including the tunnel identifier in a key field of a tunnel header of the return packets; and

means for translating the tunnel identifier into a connection and transmitting the return packets using the connection, wherein translating the tunnel identifier into the connection comprises using the tunnel identifier to identify an entry in a tunnel table and using the entry in the tunnel table to identify an entry in a connection table, wherein the tunnel table is indexed by tunnel identifiers, and wherein the entry in the connection table identifies the connection.

15. A computer readable medium having stored therein instructions for causing a processing unit to execute the following method:

10

receiving a registration request;

determining a tunnel identifier;

transmitting the registration request to the home agent, the registration request including the tunnel identifier in a key field of a tunnel header of the registration request;

receiving a response to the request and, responsively, activating a connection;

receiving data packets from the home agent in response to transmitting the registration request, the data packets including the tunnel identifier in a key field of a tunnel header of the data packets;

identifying the connection using the tunnel identifier, wherein identifying the connection using the tunnel identifier comprises using the tunnel identifier to identify an entry in a tunnel table and using the entry in the tunnel table to identify an entry in a connection table, wherein the tunnel table is indexed by tunnel identifiers, and wherein the entry in the connection table identifies the connection; and

routing the packets along the connection.

16. A computer program embedded in a computer readable medium for establishing a connection between a mobile node and a home agent, the program comprising:

first code for receiving a registration request;

second code for determining a tunnel identifier;

third code for transmitting the registration request to the home agent, the registration request including the tunnel identifier in a key field of a tunnel header of the registration request;

fourth code for receiving a response to the request and, responsively, activating a connection;

fifth code for receiving data packets from the home agent in response to transmitting the registration request, the data packets including the tunnel identifier in a key field of a tunnel header of the data packets;

sixth code for identifying the connection using the tunnel identifier, wherein identifying the connection using the tunnel identifier comprises using the tunnel identifier to identify an entry in a tunnel table and using the entry in the tunnel table to identify an entry in a connection table, wherein the tunnel table is indexed by tunnel identifiers, and wherein the entry in the connection table identifies the connection; and

seventh code for routing the packets along the connection.

* * * * *

Exhibit B



US006978128B1

(12) **United States Patent**
Raman et al.

(10) **Patent No.:** **US 6,978,128 B1**
(45) **Date of Patent:** **Dec. 20, 2005**

(54) **SYSTEM AND METHOD TO ALLOW SIMPLE IP MOBILE NODES TO OPERATE SEAMLESSLY IN A MOBILE IP NETWORK WITH TRUE ROAMING CAPABILITIES**

(75) Inventors: **Sundar Raman**, Arlington Heights, IL (US); **Chandra Warrier**, Schaumburg, IL (US); **Ningya Wang**, Schaumburg, IL (US)

(73) Assignee: **UTStarcom, Inc.**, Alameda, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 526 days.

(21) Appl. No.: **09/849,834**

(22) Filed: **May 4, 2001**

(51) Int. Cl.⁷ ............................. H04L 9/00; H04L 9/32; G06F 11/30

(52) U.S. Cl. .................. **455/414**; 455/412; 455/413; 455/417; 455/403; 455/410; 455/411

(58) Field of Search ............................... 455/412, 413, 455/414, 417, 403, 410, 411, 433; 370/229, 370/328, 856

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| 6,466,964 B1 * | 10/2002 | Leung et al. | ............... | 709/202 |
| 6,512,754 B2 * | 1/2003 | Feder et al. | ............... | 370/338 |
| 6,608,832 B2 * | 8/2003 | Forslöw | ............... | 370/353 |
| 6,622,016 B1 * | 9/2003 | Sladek et al. | ............ | 379/201.01 |
| 6,684,256 B1 * | 1/2004 | Warrier et al. | ............. | 709/238 |
| 6,707,809 B1 * | 3/2004 | Warrier et al. | ............. | 370/351 |
| 6,760,444 B1 * | 7/2004 | Leung | ........................ | 380/270 |
| 6,795,705 B1 * | 9/2004 | Warrier et al. | ........... | 455/435.1 |
| 2002/0066036 A1 * | 5/2002 | Makineni et al. | | |

OTHER PUBLICATIONS

G. McGregor, "*The PPP Internet Protocol Control Protocol (IPCP)*", Network Working Group, RFC 1332, May 1992, pp. i-12.
C. Perkins, "*IP Mobility Support*", Network Working Group, RFC 2002, Oct. 1996, pp. 1-79.
Rigney et al., "*Remote Authentication Dial In User Service (RADIUS)*", Network Working Group, RFC 2138, Apr. 1997, pp. 1-65.
Declaration for U.S. Appl. No. 09/849,834, filed on May 4, 2001.

* cited by examiner

*Primary Examiner*—Allan Hoosain
(74) *Attorney, Agent, or Firm*—McDonnell Boehnen Hulbert & Berghoff LLP

(57) **ABSTRACT**

A system and method of transmitting information between a mobile node and a home agent of the mobile node. The mobile node has an associated home AAA server. The address of the HAAA is determined. The HAAA is contacted and, responsively, receives information indicating a methodology of determining the home address of the mobile node. A proxy server determines the address of the home agent using information received from the PDSN. The information is routed from the mobile node to the home agent having the address.

**18 Claims, 6 Drawing Sheets**





FIGURE 1



| | |
|---|---|
| REALM | ABC.com |
| HA | HA1 |
| POOL | POOL1 |
| HAAA[0] | 20.1.1.1 |
| HAAA[1] | 20.1.1.10 |
| Network Type | Mobile IP |

200

212
214
10.1.1.1
.
.
.
10.1.1.100

202
204
206
208
210
216

**FIGURE 2**



FIGURE 3



FIGURE 4



FIGURE 5



FIGURE 6

US 6,978,128 B1

| 1 | 2 |

### SYSTEM AND METHOD TO ALLOW SIMPLE IP MOBILE NODES TO OPERATE SEAMLESSLY IN A MOBILE IP NETWORK WITH TRUE ROAMING CAPABILITIES

#### FIELD OF THE INVENTION

This present invention relates to allowing a mobile node, which is transmitting a data message to a destination device, to move between networks.

#### BACKGROUND OF THE INVENTION

Mobile nodes, which have become widely used in society today, may take a variety of forms. For example, the mobile node may be a cellular phone or personal communication service (PCS) device.

A mobile node may be coupled directly or indirectly to a wireless network. In turn, the wireless network may be directly or indirectly coupled to another device. The mobile node may wish to communicate with this other device.

The mobile node may be also coupled to a user device. The user device may be any device that is capable of transmitting and/or receiving any type of information. For instance, the user device may be a personal digital assistant (PDA) or a personal computer. Other types of user devices are possible.

Mobile nodes may travel within a "home" network and travel to other ("foreign") networks. Wherever the mobile node is located, other users and entities may need to send information to the mobile node and the mobile node may desire to send information to these other users and entities.

In order to determine the location of the mobile node (and transfer the information), the mobile node may be given a permanent address ("home address") on the home network. When away from the home network, the current address ("care-of address") associated with the mobile node may reflect the mobile node's current point of attachment within the foreign network. The mobile node may use its home address as the source address of all information, for example, IP datagrams that the mobile node sends or receives from other users or entities.

To facilitate the transfer of information between the mobile node and other users and entities, the home network may include a home agent. The home agent may perform several functions. For example, the home agent may maintain information concerning the mobile node, for instance, the current location of the mobile device. In another example, when another user or entity desires to communicate with the mobile node, the home agent may act as a router and "tunnel" information to the mobile node (when the mobile node is attached to a foreign network).

The foreign network may include a foreign agent, which may also perform several functions. For example, when a mobile node moves to the foreign network, the mobile node may contact the foreign agent. In one illustrative example, the foreign agent may be a router on the foreign network and provide routing services to the mobile node while the mobile node is registered on the foreign network. The foreign agent may also "detunnel" and deliver information to the mobile node that was tunneled by the mobile node's home agent.

Home agents and foreign agents may advertise their availability on each network for which they provide service. A newly arrived mobile node may send a solicitation on the foreign network to learn if any prospective foreign agents are present. When the mobile node is away from its home network, it may register its care-of address with its home

agent. Depending on its method of attachment, the mobile node may register either directly with its home agent, or through a foreign agent, which forwards the registration to the home agent.

Upon the traversal of a serving area by a mobile node, the mobile node must register with a new foreign agent. Transfer of session from one foreign agent to another may be performed using a proxy server to re-establish the mobile node user's profile information, and the home agent to re-establish the connection profile for the session.

#### SUMMARY OF THE INVENTION

The system and method of the present invention advantageously allows a mobile node to transmit data to a user device while moving between networks. Conveniently, the address of the home agent of the mobile node may be determined by using a proxy server, no matter where the mobile node is located.

In one embodiment of the present invention, a mobile node is coupled to a proxy server. The mobile node may have a home agent and an associated home administration, authorization, and authentication (HAAA) server.

The proxy server may determine the address of the HAAA. The proxy server may contact the HAAA and, responsively, may receive information indicating a methodology to determine the address of the home agent of the mobile node. The proxy server may determine the address of the home agent using information received from the HAAA. Information may then be routed from the mobile node to the home agent having the address. Thereafter, if the mobile node moves to a different network, the above procedure may be repeated and connectivity with the home agent will not be lost.

In another embodiment of the present invention, a mobile node is coupled to a wireless network. A PDSN is also coupled to the wireless network and a proxy server is coupled to the PDSN. A HAAA server is coupled to the proxy server and a home agent is coupled to the PDSN.

The mobile node may send a request message to the wireless network, and the wireless network may send the request message to the PDSN. The PDSN may forward the request message to the proxy server. The proxy server may have a table and PDSN may determine the address of the HAAA from the table. The HAAA may be contacted and may send information representative of an IP address assignment to the proxy server. The proxy server may determine the address of the home agent based upon the information. The message may thereafter be routed to the home agent having the address.

In another embodiment of the invention, upon the traversal of the mobile node between packet data serving areas, the proxy server may determine that the mobile node has 'roamed', or traversed to a new packet data serving node or foreign agent, and may explicitly reclaim any resources (perform "resource allocation") affiliated with the original session on the original foreign agent. The mechanism of resource management may be performed in conjunction with reclaiming resources allocated to the original session on the home agent. Reclaiming of resources from the original foreign agent by the proxy server may be performed using resource-management messages following the RADIUS protocol for communication. Management of resources on the home agent by the foreign agent may be triggered by the completion of the resource reclamation procedure between the proxy server and the foreign agent, and may follow the mobile IP de-registration procedures.

These as well as other features and advantages of the present invention will become apparent to those of ordinary skill in the art by reading the following detailed description, with appropriate reference to the accompanying drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

Preferred embodiments of the present inventions are described with reference to the following drawings, wherein:

FIG. 1 is a diagram illustrating a preferred embodiment of the system for transmitting data to a home agent in accordance with the present invention;

FIG. 2 is one example of a table used by the proxy server in accordance with a preferred embodiment of the present invention;

FIG. 3 is a call-flow diagram illustrating setting up a connection in accordance with a preferred embodiment of the present invention;

FIG. 4 is a call-flow diagram illustrating tearing down a connection in accordance with a preferred embodiment of the present invention;

FIG. 5 is a flow chart of the operation of the proxy server in accordance with a preferred embodiment of the present invention; and

FIG. 6 is a call-flow diagram illustrating resource allocation in accordance with a preferred embodiment of the present invention.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS

Referring to FIG. 1, a system includes a mobile node **102**, a first network **104**, a second network **109**, a first packet data serving node (PDSN) **106**, a second PDSN **112**, a proxy server **108**, a home agent **114**, a first home administration, authorization, and authentication (HAAA) server **116**, a second HAAA server **118**, and a destination device **120**. A database **107** may be coupled to the proxy server **108**.

The mobile node **102** may be coupled to the network **104** via a connection **103** or to the network **109** via the connection **110**. The network **104** may be coupled to the PDSN **106** via a connection **105** and the network **109** may be coupled to the PDSN **112** via a connection **111**. The PDSN **106** and the PDSN **112** may be coupled to the proxy server **108** and the home agent **114**. The proxy server **108** is coupled to the HAAA **116** and the HAAA **118**. The home agent **114** is coupled to the destination device **120**.

The mobile node **102** is any type of mobile wireless device. For example, the mobile node may be a cellular telephone, a PCS device, or a personal digital assistant (PDA). Of course, other types of mobile nodes are possible.

The networks **104** and **109** may be an IS-95/CDMA or CDMA2000 wireless network. For example, the network may be a wireless cellular communication network. The networks **104** and **109** may also include a variety of devices such as base stations, MSCs, and switches. Of course, the networks **104** and **109** may include other devices, as well.

The first PDSN **106** and the second PDSN **112** may aggregate traffic from the networks **104** and **109** and provide a path for this traffic to a data network. In one example, the PDSN **106** and PDSN **109** may be CommWorks Corporation Packet Data Serving Node. Of course, other examples of PDSNs are possible.

The functions of the proxy server **108** may be implemented by a processor using computer instructions stored in a memory. The proxy server **108** may determine the address of the home agent **114** so that as the mobile node **102** moves between networks **104** and **109**, connectivity between the mobile node **102** and the destination device **120**.

The home agent **114** may be any server that has home agent capabilities. In one example, the home agent **114** is a home agent manufactured by CommWorks Corporation. The home agent **114** tunnels information from the mobile node **102** to the destination device **120**.

The first HAAA server **116** and the second HAAA server **118** may be any type of HAAA server. In one example, the first HAAA server **116** and the second HAAA server **118** may be a Funk Software Steel Belted RADIUS server.

In one example of the operation of the network of FIG. 1, the mobile node **102** having a domain address (e.g., ABC.com) may establish a session with the network **104** and the PDSN **106**. For example, LPC negotiations may be performed to establish the session.

The PDSN **106** may send an access-request message, for example, a CHAP access-request message to the proxy server **108**. The proxy server **108** may determine a HAAA server **116** or **118** based upon the domain address. For example, as described elsewhere in this specification, the proxy server may use a table to find the address of the HAAA relating to the domain address. The proxy server **108** may send the access-request message to the HAAA **116**.

The HAAA **116** may return an access-accept message to the proxy server. The access-accept message may include an indication of the methodology to be used to determine the home address of the mobile node **102**. For example, the indication of methodology may indicate that the proxy should use a static address for the home address as assigned by the HAAA or consult a local address pool ("dynamic addressing") to determine the home address of the mobile node. In the case of a static address, a fixed address (e.g., 10.10.10.10) may be used to indicate that the home address of the mobile node is fixed, and provided by the HAAA. This value is provided in the IP address attribute of an access-accept message. In the case of dynamic addressing, the absence of the IP Address attribute, or the existence of a predetermined IP address (e.g. 255.255.255.254) may be used to instruct the proxy to use an address pool to find the address of the home agent.

In addition to the home address for the mobile node, the proxy may assign a home agent address. The value may be provided in the Next-Hop-Gateway attribute of the access-accept message. The value may be indicated by the HAAA. The absence of the attribute indicates to the proxy that it should select a home agent address for the request based on request parameters (for e.g. the domain name). Of course other indications of methodology and other methodologies are possible.

The proxy server **108** may receive the message and from the indication of methodology determine the address of the home agent **114**. This address may be passed to the PDSN **106**. The PDSN **106** then may route all messages from the mobile node **102** through the home agent **114** to the destination device **120**.

If the mobile node **102** moves to the network **109** (via connection **110**), a teardown procedure may be performed. Thereafter, the same procedure as described above may be used to establish a connection to a home agent **114**, this time via the PDSN **112**.

Referring now to FIG. 2, one example of a table used by a proxy server is described. A table **200**, has a realm entry **202**. In this case, the realm entry is ABC.com. The table also has a home agent entry **204**. In this case, the entry indicates

US 6,978,128 B1

5

the address of the home agent, HA1. HA1 may itself be a pointer to the actual address, for example, "10.1.1.1".

The table 200 also has a pool entry 206, which is "POOL1." POOL1 points to an address pool 214, which includes a plurality of home agent addresses. The table also includes a preferred HAAA entry 208 and a secondary HAAA entry 210, which have addresses of 20.1.1.1 and 20.1.1.10, respectively. The table 200 also includes a network type field 216, which is set to "Mobile IP". The field could also have values of "Simple IP", or "Mobile Proxy Agent". Of course, there may be other fields in the table and additional entries for different realms.

Referring now to FIG. 3, one example of a session set-up procedure is described. This example describes communications between a mobile node, network, PDSN, proxy server, home agent (HA) and HAAA coupled together as illustrated in FIG. 1.

At step 302, an access-request message, for example an access-request message conforming to the CHAP protocol, is sent from the PDSN to the proxy server. At step 304, the proxy server determines that there is no existing session (from information in its database), selects a HAAA server, and sends the access-request message to the HAAA server.

At step 306, the HAAA server sends a access-accept message to the proxy server. For example, the message may contain information indicative of the methodology that the proxy server may use to determine the home address of the mobile node. In addition, the message may include, the framed IP address, framed compression type, and frame protocol.

At step 308, the proxy server selects an address of the home agent (based upon the information indicative of methodology) and creates a session. A session is defined by a record inserted into a database (either local or network accessible) which stores the user's connection information. The proxy server sends an access-accept message, for example, including the IP address of the home agent, to the PDSN.

At step 310, the PDSN sends a request to set up a link to the home agent. The request, for example, may be in the form of a registration request (RRQ) message according to the Mobile IP protocol as defined in RCF2002. The message may include the address of the home agent and other information.

At step 312, the home agent sends a response to the request (at step 310) indicating that the link can be set-up. The response, for example, may be in the for of a registration response (RRP) message according to the Mobile IP protocol. The response message is an acknowledgement of receipt of the request.

At step 314 a configuration request message is sent from the mobile node to the PDSN. In one example, the configuration request message may be in the form of a IPCPConfigRequest message according to the IPCP protocol defined in RFC1332. The purpose of the configuration request message is to open a connection for communication between the mobile node and the PDSN.

At step 316 a configuration request message is sent from PDSN to the mobile node. In one example, the configuration request message may be in the form of an IPCPConfigRequest message according to the IPCP protocol. The purpose of this configuration request message is to open a IP connection for communication between the PDSN and the mobile node.

At step 318, the PDSN sends a configuration acknowledgment in response to the configuration request message sent at step 314. For example, the configuration acknowledgement message may be a IPCPConfigack message

6

according to the IPCP protocol and include the IP address assigned to the user. The purpose of the configuration acknowledgement message is to provide an indication of receipt and acceptance of the connection request from the mobile node.

At step 320, the mobile node sends a configuration acknowledgment in response to the configuration request message sent at step 316. For example, the configuration acknowledgement message may be an IPCPConfigack message according to the IPCP protocol. The purpose of the configuration acknowledgement message is to indicate acceptance of the connection request from the PDSN.

At step 322, the PDSN sends an accounting request message to the proxy server. The purpose of the message is initial transmission of billing information. The accounting message may be a start message according to the RADIUS protocol.

At step 324, the proxy server forwards the accounting request message to the HAAA server. The accounting message may be a start message according to the RADIUS protocol.

At step 326, the HAAA sends an accounting response message to the proxy server. The purpose of the response message is acknowledgement of receipt of the accounting request message. The accounting response message is sent according to the RADIUS protocol.

At step 328, the proxy server forwards the accounting response message to the PDSN. The purpose of the accounting response message is acknowledgment of receipt of the accounting request message. The accounting response message is sent according to the RADIUS protocol.

Referring now to FIG. 4, a teardown procedure is described. This example describes communications between a network, PDSN, proxy server, home agent (HA) and HAAA coupled together as illustrated in FIG. 1.

At step 400, the network sends the PDSN a RRQ-lifetime message, which requests that the connection between the mobile and the home agent be torn down. At step 402, the PDSN responds by sending a RRQ-Accept message to the network, which informs the network that the request to tear down the connection has been accepted.

At step 404, the PDSN sends an accounting request message to the proxy server. The purpose of the message is to indicate termination of the billing session. The accounting message may be a stop message according to the RADIUS protocol.

At step 406, the proxy server forwards the accounting request message to the HAAA server. The purpose of the message is to notify the HAAA of the accounting session termination. The accounting message may be a stop message according to the RADIUS protocol.

At step 408, the HAAA sends an accounting response message to the proxy server. The purpose of the response message is acknowledgement of receipt of the accounting request message. The accounting response message is sent according to the RADIUS protocol.

At step 410, the proxy server forwards the accounting response message to the PDSN. The purpose of the response message is acknowledgement of the accounting request message. The accounting response message is sent according to the RADIUS protocol.

At step 412, the PDSN sends a Resource Free Request message to the Proxy server. The purpose of the message is clean up and removal of active session information from the proxy's session database. The message is formatted according to the RADIUS protocol.

**7**

At step 414, the proxy server responds with a Resource Free Response message that is sent to the PDSN. This response message is formatted according to the RADIUS protocol.

At step 416, the PDSN sends a deRRQ-Lifetime message to the home agent. The message may be according to the Mobile IP protocol. The purpose of this message is removal of any active session information on the home agent.

At step 418, the home agent responds with a deRRP Accept message that it sends to the PDSN. The message may be according to the Mobile IP protocol. The purpose of this message is acknowledgement of the request message. At this point, the session has been torn down.

Referring now to FIG. 6, one example of a transfer of session from one foreign agent to another due to traversal of a packet data serving area is described. In FIG. 6, a mobile node ("MN") moves from a first PDSN ("PDSN_src") to a second PDSN ("PDSN₁₃ tgt"). The MN has a home agent, a home radius server, and a proxy server associated with it.

At step 600, the mobile node has an active connection established with the PDSN_src, as has been described elsewhere in this specification.

At step 601 the mobile node has traversed from the packet data serving area covered by the PDSN_src to the area covered by the PDSN_tgt. At step 602, the mobile node may attempt to establish a new connection with the PDSN_tgt, by initiating LCP negotiations and authentication procedures. At step 603, the PDSN_tgt may send an access-request message for authentication to the proxy server. The proxy server may communicate the authentication request to the home AAA server at step 603a and receive an access-accept message at step 603b.

At step 604, the proxy server may accept the request for authentication by the PDSN_tgt by sending an access-accept message to the PDSN_tgt.

At step 605, the proxy server may be triggered (by the request for authentication from the traversing mobile node) to reclaim the resources that remain from the original session on the PDSN_src, prior to traversal. The request for resource-reclaim may be acknowledged by the PDSN_src in step 606 with a resource-free-request. The proxy server may respond to the request with a resource-free-response in step 607. Messages for steps 603, 604, 605, 606, 607, and 608 may be formatted according to the RADIUS protocol.

At step 608, the PDSN_src may delete all information about the session from its Visitor List databases. At step 609, the PDSN_src may send a de-registration request (de-RRQ) for example, with lifetime=0, to the home agent. The message may be according to the Mobile IP protocol. The purpose of this message is removal of any active session information on the home agent.

At step 610, the home agent may respond with a de-registration response (de-RRP) message that it may send to the PDSN_src. The message may be according to the Mobile IP protocol. The purpose of this message is acknowledgement of the request message.

At step 611, the PDSN_tgt may send a RRQ message in order to establish a registration with the home agent. The RRQ may have a non-zero or infinite lifetime. At step 612, the home agent may respond with a RRP message, indicating acknowledgement of the request.

At step 613, a CHAP accept message may be sent from the PDSN_tgt to the mobile node. The purpose of this message is to indicate to the mobile node that authentication was completed successfully. At step 614, IPCP negotiations take place between the mobile node and the PDSN_tgt. The

**8**

purpose of these negotiations is to establish an IP communication connection between the mobile node and the PDSN. At this point, the session has been torn down on the PDSN_src, and the session has been actively transferred to the PDSN₁₃ tgt.

Referring now to FIGS. 2 and 5, one example of the operation of a proxy server is described. At step 502, the proxy server receives the message from an outside entity (e.g., the PDSN or the HAAA) and determines the type of message.

If the type of message is an access-request, then at step 504, the proxy server determines the address of the HAAA using a table stored at the proxy server. For example, assuming that the message includes a domain name of "ABC.com", the proxy server may look at a table of FIG. 2 and determine that, as a first choice, the HAAA has an address is 20.1.1.1. At step 506, the access-request message is passed to the HAAA with the address of 20.1.1.1. Execution then ends.

If the type of message is an access-accept, then at step 508, the proxy server determines the home address of the mobile node. In order to determine the address, the proxy server examines the access-accept message. In one example, the access-accept message includes a field, which indicates the methodology the proxy server may use to determine the home address of the mobile node. For example, if the field IP Address exists and contains an IP address assigned by the HAAA, the proxy server may use the address proposed. In another example, the field may not exist, or may have a magic IP address value (e.g. 255.255.255.254). This indicates to the proxy server to find an address from a pool. The proxy server may consult its table and find the pool, then find an address from the pool. The proxy server may also assign a home agent address for the mobile node. The home agent address may be determined from the domain name (ABC.com). The home agent address then may be sent in the Next-Hop-Gateway field of the access-accept message. Of course, other methodologies may be indicated and other methods of determining the address are possible. At step 510, the proxy server forwards the access-accept message and address to the PDSN. Execution then ends.

If the type of message is an accounting request, then at step 512, the proxy server may perform no processing except to generate a message to be forwarded, and the proxy server passes the message to another entity. Execution then ends.

If the type of message is an accounting response, then at step 516, the proxy server message keep the proxy server then may forward the message intact o another entity. Execution then ends.

It should be understood that the programs, processes, methods and systems described herein are not related or limited to any particular type of computer or network system (hardware or software), unless indicated otherwise. Various types of general purpose or specialized computer systems may be used with or perform operations in accordance with the teachings described herein.

In view of the wide variety of embodiments to which the principles of the present invention can be applied, it should be understood that the illustrated embodiments are exemplary only, and should not be taken as limiting the scope of the present invention. For example, the steps of the flow diagrams may be taken in sequences other than those described, and more or fewer elements may be used in the block diagrams. While various elements of the preferred embodiments have been described as being implemented in software, in other embodiments in hardware or firmware implementations may alternatively be used, and vice-versa.

US 6,978,128 B1

9

It will be apparent to those of ordinary skill in the art that methods involved in the system and method for determining the address of a home agent may be embodied in a computer program product that includes a computer usable medium. For example, such a computer usable medium can include a readable memory device, such as, a hard drive device, a CD-ROM, a DVD-ROM, or a computer diskette, having computer readable program code segments stored thereon. The computer readable medium can also include a communications or transmission medium, such as, a bus or a communications link, either optical, wired, or wireless having program code segments carried thereon as digital or analog data signals.

The claims should not be read as limited to the described order or elements unless stated to that effect. Therefore, all embodiments that come within the scope and spirit of the following claims and equivalents thereto are claimed as the invention.

What is claimed is:

1. A method of transmitting data between a mobile node and a home agent for the mobile node, the mobile node having an associated authentication server, the method comprising:

establishing a first communication between a first packet data serving node (PDSN) and the mobile node located in a first network;

determining at a proxy server an address of the authentication server;

contacting the authentication server and, responsively, receiving information from which an address of the home agent for the mobile node may be determined;

determining the address of the home agent using the information received from the authentication server;

sending the address of the home agent from the proxy server to the first PDSN;

sending, from the authentication server to the proxy server, a methodology for determining a home address for the mobile node;

using, at the proxy server, the methodology to determine the home address for the mobile node;

sending the home address for the mobile node from the proxy server to the first PDSN;

sending, from the first PDSN to the home agent at the address of the home agent, a first registration request message for establishing a first registration between the first PDSN and the home agent;

routing the data from the mobile node to the home agent via the first PDSN.

2. The method of claim 1 further comprising:

moving the mobile node to a second network, wherein the second network comprises a second PDSN;

establishing a second communication between the mobile node and the second PDSN;

re-determining at the proxy server the address of the authentication server for the mobile node;

re-contacting the authentication server and, responsively, receiving information from which the address of the home agent for the mobile node may be determined;

re-determining the address of the home agent;

sending the address of the home agent from the proxy server to the second PDSN;

sending, from the second PDSN to the home agent at the address of the home agent, a second registration request message for establishing a second registration between the second PDSN and the home agent; and

re-routing data from the mobile node to the home agent via the second PDSN.

10

3. The method of claim 2, further comprising:

sending a resource reclaim message to the first PDSN from the proxy server;

sending a de-registration request message from the first PDSN to the home agent for the removal of active connection information at the home agent.

4. The method of claim 1, wherein the methodology comprises the authentication server sending the home address for the mobile node to the proxy server.

5. The method of claim 1, wherein the methodology comprises the proxy server selecting the home address for the mobile node from a pool of addresses stored in the proxy server.

6. The system of claim 1, wherein the information indicates that the proxy server should assign the home agent address.

7. The system of claim 1, wherein the information comprises the authentication server providing a value of the home agent address to the proxy server.

8. A system comprising:

a mobile node;

a wireless network coupled to the mobile node;

a packet data serving node (PDSN) coupled to the wireless network;

a proxy server coupled to the PDSN, the proxy server including a table comprising an address pool;

an authentication server coupled to the proxy server; and

a home agent coupled to the PDSN;

wherein the mobile node sends a access-request message to the wireless network, and the wireless network sends the access-request message to the PDSN;

wherein the PDSN forwards the access-request message to the proxy server;

wherein the proxy server determines the address of the authentication server;

wherein the authentication server receives the access-request message from the proxy server and, responsively, sends the proxy server information indicating (i) a first methodology of determining an address of the home agent, and (ii) a second methodology of determining a home address of the mobile node;

wherein the proxy server determines the address of the home agent using the first methodology and determines the home address of the mobile node using the second methodology;

wherein the proxy server sends the address of the home agent address and the home address of the mobile node to the PDSN; and

wherein a data message from the mobile node is thereafter forwarded to the home agent via the PDSN.

9. The system of claim 8 wherein the second methodology comprises determining the home address of the mobile node statically.

10. The system of claim 8 wherein the second methodology comprises determining the home address of the mobile node dynamically.

11. The system of claim 8 wherein the second methodology comprises determining the home address of the mobile node from the address pool.

12. The system of claim 8 wherein the network includes a PDSN.

13. The system of claim 8 wherein said mobile node subsequently moves to a second network and the address of the authentication server, the mobile node, and the home agent are re-determined.

US 6,978,128 B1

11

**14**. The system of claim **8**, wherein the PDSN sends the home address of the mobile node to the mobile node.

**15**. The system of claim **8**, wherein the data message is forwarded by routing the data message.

**16**. The system of claim **8**, wherein the data message is forwarded by tunneling the data message.

12

**17**. The system of claim **8**, wherein the first methodology comprises the proxy server assigning the home agent address.

**18**. The system of claim **8**, wherein the first methodology comprises the authentication server providing a value of the home agent address to the proxy server.

*     *     *     *     *

Exhibit C



US006963582B1

(12) **United States Patent** (10) **Patent No.:** **US 6,963,582 B1**
Xu (45) **Date of Patent:** **Nov. 8, 2005**

(54) **APPLYING MODIFIED MOBILE INTERNET PROTOCOL (IP) IN A WIRELESS MOBILE DATA NETWORK INTERFACE**

(75) Inventor: **Yingchun Xu**, Buffalo Grove, IL (US)

(73) Assignee: **UTStarcom, Incorporated**, Alameda, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/515,560**

(22) Filed: **Feb. 29, 2000**

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 08/887,313, filed on Jul. 3, 1997.

(51) Int. Cl.[7] ............................................. H04J 3/22
(52) U.S. Cl. ...................... 370/466; 370/469; 370/401; 370/392
(58) Field of Search ............................... 370/319, 320, 370/321, 335, 336, 337, 342, 343, 344, 349, 370/465, 466, 469, 401, 392, 390, 389, 474, 370/328, 338, 400, 467; 709/225, 226, 227

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,970,059 A | * | 10/1999 | Ahopelto et al. | 370/338 |
| 6,240,514 B1 | * | 5/2001 | Inoue et al. | 713/153 |
| 6,366,561 B1 | * | 4/2002 | Bender | 370/238 |
| 6,377,571 B1 | * | 4/2002 | Tai | 370/355 |
| 6,452,920 B1 | * | 9/2002 | Comstock | 370/349 |
| 6,496,704 B2 | * | 12/2002 | Yuan | 455/466 |
| 6,522,880 B1 | * | 2/2003 | Verma et al. | 455/436 |
| 6,535,493 B1 | * | 3/2003 | Lee et al. | 370/329 |
| 6,651,105 B1 | * | 11/2003 | Bhagwat et al. | 709/239 |
| 2003/0035438 A1 | * | 2/2003 | Larsson | 370/466 |

OTHER PUBLICATIONS

W. Townsley, A. Valencia, G. Pall, G. Zorn, and B. Palter, Networking Working Group, "Layer Two Tunneling Protocol L2TP", Aug. 1999, p. 9.*
Darryl Schick, 1999 Wireless Symposium, *3G Wideband CDMA Technology, Part 1: Overview of IMT-2000*, 1999, pp. 1-29.
G. Montenegro, ed., Network Working Group, *Reverse Tunneling for Mobile IP Status*, May 1998, pp. 1-33.

* cited by examiner

*Primary Examiner*—Ricky Ngo
*Assistant Examiner*—Duc Duong
(74) *Attorney, Agent, or Firm*—McDonnell Boehnen Hulbert & Berghoff LLP

(57) **ABSTRACT**

A wireless communication system for mobile devices including an air interface and a packet network. A modified mobile IP interface is utilized to provide a communication protocol for the wireless air interface. The wireless communication protocol is interfaced to a Generic Routing Encapsulation data tunneling protocol to transport communications through a packet switched data communication network. The Generic Routing Encapsulation header encapsulates the communication and control information and also accepts a network address as a session ID values to identify different communication sessions.

8 Claims, 2 Drawing Sheets





# Figure 1



# Figure 2



Modified GRE Header    ⌐ 96

# Figure 4



# Figure 3

US 6,963,582 B1

1

## APPLYING MODIFIED MOBILE INTERNET PROTOCOL (IP) IN A WIRELESS MOBILE DATA NETWORK INTERFACE

### CROSS-REFERENCE TO RELATED APPLICATION

This is a continuation-in-part of the patent application of Yingchun Xu et al., entitled Network Access Methods, Including Direct Wireless to Internet Access, application Ser. No. 08/887,313 filed Jul. 3, 1997, the entire contents of which are fully incorporated herein.

### BACKGROUND OF THE INVENTION

A. Field of the Invention

This invention relates generally to systems that provide mobile Internet Protocol networking, wherein a mobile communications device such as a portable laptop computer or handheld personal digital assistant device may communicate with a host computer on a data packet network. More particularly, the invention relates to the interfaces between mobile and IP communications networks.

B. Description of Related Art

Packet switched data networks can be used to carry data traffic to and from mobile communications devices, such as a laptop computer or handheld personal digital assistant ("PDA") computer. With these portable devices and mobile wireless radio capability, users may freely move about a geographic area, yet still be able to remotely access packet data networks such as the Internet to view information on the World Wide Web or access their home networks to access E-mail and data. Using the new class of portable PDA devices such as 3Com's Palm VII equipped with a cellular telephone modem and a wireless radio network will allow a new mobile computing network paradigm and further expand networking and mobile communication to portable devices.

Wireless mobile computing will likely use the same Internet Protocol ("IP") protocols that provide networking over most fixed computer networks including the well-known Internet. IP, however, was originally designed for fixed networks without mobile wireless nodes. The basic architecture for mobile IP data networking is also emerging and described in several publications, including the Request for Comments document RFC 2002 (1996) and in the textbook of Charles E. Perkins, *Mobile IP Design Principles and Practices*, Addison-Wesley Wireless Communications Series (1998), both of which are fully incorporated by reference herein. While IP networks are still expanding in popularity, wireless IP is the next frontier in mobile computing.

Needed are more methods and techniques to interface the wireless radio network with conventional data packet networks.

### SUMMARY OF THE INVENTION

The present invention represents an improvement to the interface between wireless mobile networks and packet data networks. The present embodiments contemplate a modified Mobile IP protocol combined with a modified Generic Routing Encapsulation ("GRE") data tunneling protocol to implement the air-to-packet network or Radio-Packet ("R-P") interface. Generally, the modified Mobile IP interface with appropriate extensions is used for call control signaling and the modified GRE tunneling is used to transport user

2

data. The Mobile IP call signaling messages may operate over User Datagram Protocol ("UDP") [RFC 768] which in turn is placed in the payload portion of an IP or UDP/IP Packet and manage the R-P connections. Modified GRE frames are used for transport of user traffic, such as PPP frames or link layer PDUs between the mobile station and the Packet Data Serving Node ("PDSN").

In the preferred embodiment, each mobile node communicates with a Radio Node ("RN") providing a Radio Node Mobile Agent ("RNMA") for each mobile node call connection to facilitate connectivity from the mobile network device to the packet network. Each RNMA is preferably allocated a Home Agent Address, referred to a "RNHomeAddress", assigned upon RNMA creation. Preferably, each RNHomeAddress is unique within the RN. The RNMA in the exemplary embodiment uses Mobile IP signaling to register the allocated RNHomeAddress using a Radio Node Foreign Agent ("RNFA") to send a Registration Request message. The RNHomeAddress will be assigned to the Home Address field of the Registration Request message.

After successful registration, the link layer session mapping has been successfully established and the call connection may be used to transport user data from the mobile device. For example, Point-to-Point Protocol ("PPP") frames may pass data over the connection in both directions using a modified GRE framing. The GRE standard in RFC 1701 specifies a protocol for performing encapsulation of an arbitrary network layer protocol over another arbitrary network layer protocol. In the preferred embodiment, the GRE header is modified to accept the RNHomeAddress as a Session ID value. In the exemplary embodiment, the same RNHomeAddress in the Home Address field of Mobile IP registration message is used with the Session ID used in GRE Header. Preferably, the Home Address inside the GRE header is used as a Session ID to identify each different link layer session.

The presented embodiments have several advantages. The present embodiments eliminate the necessity of a separate Tunneling ID and Session ID as used in other protocols. Preferably, the proposed protocol is independent of the details of the physical and link layer technologies over which the R-P connection is established. Each call connection is uniquely identified by the pair value (Home Address, Care-of Address). The Mobile IP/GRE tunneling is connectionless although it carries connection-oriented Link Layer session such as PPP. Eliminated is the need for a separate tunneling ID and Session Id as used in other protocols.

The foregoing and other features and advantages of preferred embodiments of the present invention will be more readily apparent from the following detailed description. The detailed description proceeds with references to the accompanying drawings.

### BRIEF DESCRIPTION OF THE DRAWINGS

In the following description, reference will be made to the appended drawings, wherein like reference numbers refer to like elements in the various views, and in which:

FIG. 1 is an illustration of a mobile networking access system of the preferred embodiment;

FIG. 2 is an illustration of a mobile IP networking system in accordance with a preferred embodiment of the invention showing the mobility agents, foreign and home agents according to the preferred embodiment;

FIG. 3 is a diagram of a GRE encapsulated PPP packet according to a preferred embodiment of the invention;

US 6,963,582 B1

3

FIG. 4 is a diagram of the modified GRE header according to a preferred embodiment of the invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT OF THE INVENTION

With reference to FIG. 1, shown is the overall schematic view of a network access system enabling wireless access to a data packet networks to provide mobile voice and data networking according to an exemplary embodiment of the present invention. A plurality of mobile stations or mobile nodes 20 allows a portable handheld device such as a Personal Digital Assistant ("PDA") with a wireless radio air interface 22 to access data networks including an Internet Protocol ("IP") network 30 and its home network 32. The IP network 30 may provide access to a number of other networks, databases, resource or network services. The mobile node 20 is associated with a Home IP network 32 which is its permanent home network service. The basic architecture of the network access system is described in "Network Access Methods, Including Direct Wireless to Internet Access," application Ser. No. 08/887,313 filed Jul. 3, 1997, of which this application is a continuation-in-part and the entire contents of which are fully incorporated by reference herein.

In this preferred embodiment, the mobile node 20 preferably includes an air interface 22 providing wireless communication capability such as a 3G CDMA (Code Division Multiple Access) network providing a wireless high-speed packet data service. 3G CDMA is an emerging standard for next generation wireless voice and data communications network. Of course, it should be understood that other wireless protocols may also be used. The wireless high-speed packet data service 22 can provide users mobile access to data networks such as an IP network or the Internet while moving about a city, walking down the street or traveling in cars, trains, etc.

The Wireless air interface 22 is preferably provided by a base station ("BS") or Mobile Switching Center ("MSC") including a Radio Node ("RN") 24 implementing the wireless communication network 22 to a plurality of mobile stations 20, such as a 3G CDMA wireless communication system. The RN 24 includes the Radio-Packet ("R-P") interface 26 that provides the communication interface to allow the wireless network RN 24 to communicate to the Packet Data Serving Node ("PDSN") 28 in order to transmit information between the mobile stations 20 and the IP network 30. Such a R-P interface 26 may be used with, for example, 3G CMDA high-speed packet data service as well as future voice over IP services. The R-P interface 26 provides many different functions, including Packet Control Function ("PCF") to PCF Handoff to manage link layer mobility, tunneling user PPP frame from RN (Radio Node, or BSC) to PDSN (Packet Data Serving Node) 28 and vice versa, allocating PDSN 28 during PCF to PCF handoff, supporting QoS (Quality of Service) for user data tunneling, and supporting packet data billing within PDSN 28. Generally, the PDSN 28 provides an interface to access a packet network such as the Internet 30.

In the Mobile IP scheme according to the RFC 2002 Mobile IP standard, the mobile node 20 is identified by its "home address" on its home IP network 32, regardless of the mobile node's current means of accessing or current attachment point to the network. To facilitate mobile networking while away from its home network 32 and accessing its home network 32 remotely over the air interface 22, the

4

mobile node 20 is also associated with a "care-of address" which provides information specific to its current point of attachment to the network. The Mobile IP protocol utilizes mobility agents, such as foreign and home agents, to provide the mobile node 20 access to network resources and its home network 32. Generally, a foreign agent allows for registering a care-of address with a home agent in order to address packets to the mobile node 20 utilizing a network tunnel connection between the home and the foreign agent. The home agent sends datagrams destined for the mobile node 20 through a network tunnel connection from the home agent to the foreign agent care-of address. Foreign and home agents are described in more detail below.

With this Mobile IP scheme, a mobile node 20 is given a long-term IP address or home address on a home network in the same way a permanent IP address is given to a stationary host on the network. The care-of address associated with the mobile node 20 is then utilized to reflect the mobile node's current point of attachment accessing the network.

### Mobility Agents

The basic Mobile IP scheme is more specifically described in RFC 2002, which is hereby fully incorporated by reference. Generally in Mobile IP communication, a wireless mobile node 20 communicates with a terminal on an IP network 30 by means of a foreign agent and a home agent as introduced above. The foreign agent provides routing services for the mobile node 20 while it is registered with the foreign agent. Typically, foreign agent functionality is incorporated into a router or network access server chassis located on the mobile node's visited network, such as the RN 24. The foreign agent de-tunnels and delivers datagrams to the mobile node 20 that were tunneled by the mobile node's home agent.

A home agent is preferably located on a router on the mobile node's home network 32 that tunnels datagrams for delivery to the mobile node 20 via the foreign agent when the mobile node 20 is away from its home network 32. The home agent preferably maintains current location information for the mobile node 20, through a variety of possible mechanisms, such as described in the patent application of Richard J. Dynarski, et al., "Dynamic Allocation of Wireless Mobile Nodes Over an Internet Protocol (IP) Network", Ser. No. 09/233,381, which is incorporated by reference herein. When one or more home agents are handling calls for multiple mobile nodes simultaneously, the home agent(s) are providing, in essence, a service analogous to virtual private network services. Each mobile node 20 is typically associated with a separate home network and the routing path from that home network 32, through the home agent, to the foreign agent and mobile node 20. Different arrangements of home and foreign agents are described further in the application of Yingchun Xu et al., entitled Mobile Internet Protocol (IP) Networking With Home Agent And/Or Foreign Agent Functions Distributed Among Multiple Devices, application Ser. No. 09/354,659, filed Jul. 16, 1999 and Virtual Home Agent Service Using Software Replicated Home Agents, application Ser. No. 09/248,617, filed on Feb. 25, 1999, both of which are fully incorporated by reference.

The traffic tunneled or exchanged between the foreign agent and the home agent preferably includes control traffic, e.g., registration request and registration reply messages and session control messages, and user data traffic. The control traffic typically terminates at the home agent. The data traffic is routed through from the mobile node's home network 32 to a second network, such a IP network 30 for delivery to the target host. The target host could be connected to the home

US 6,963,582 B1

5

network by any arbitrary number of intermediate IP networks, or could be on the mobile node's home network.

Thus, from the above discussion, it can be seen that the home agent can perform several tasks for the home agent and mobile node 20. First, the home agent can perform an authentication and registration process to determine whether the mobile node 20 is authorized to access the home network 32. This may involve checking the identification of the mobile node 20 (such as, through use of the mobile node's unique serial number or manufacturing number), password authentication, and possibly checking that the mobile node's account is current and paid in full. The home agent registration and authentication functions may be performed in conjunction with, or with the assistance of, a second device, such as an authentication, authorization and accounting server such as a RADIUS server. See the patent application of Yingchun Xu, Ser. No. 08/887,313 filed Jul. 3, 1997 for further details.

Second, the home agent tunnels data from the target host to the foreign agent and also provides tunneling services in the reverse direction, i.e., provide packet re-addressing for traffic from the foreign agent to the host. To coordinate tunneling in the reverse direction, the home agent provides a forwarding "care-of" address to the foreign agent to tell the foreign agent where to tunnel traffic from the mobile node 20 so that it can be sent to the host. This forwarding address is typically contained in a Registration Reply message sent to the foreign agent notifying the foreign agent that the mobile node is authenticated to communicate in the home network. Registration Request and Reply messages are described further in more detail herein. The home agent also receives the tunneled traffic from the foreign agent for routing onto the home network, and therefore the forwarding address is the home agent's IP address.

The foreign agent also performs several tasks for the mobile node 20, similar to that of the home agent. First, the foreign agent has to handle the registration and session control aspects for the mobile node 20, including sending Registration Request messages to the home agent and processing Registration Reply messages. Second, the foreign agent has tunneling responsibilities for forwarding data packets to the home agent for ultimate distribution to the destination, and de-tunneling data from the home agent and forwarding the data to the mobile node.

FIG. 2 shows an exemplary architecture of the preferred embodiment of the network access system providing wireless access to a plurality of mobile nodes 20A, 20B, 20C through mobile air interface 22, RN 24 and PSDN 28. The Mobile Nodes 20A, 20B and 20C access the RN 24 via the air interface 22 provided by a cellular radio network such as a 3G CDMA network discussed previously. In this preferred embodiment, the RN 24 emulates the foreign agent functions and the PSDN 28 implements the home agent functions described above. Both home agent and foreign agent functions described above will be mapped into Packet Control Function ("PCF") (part of Radio Node function) as Radio Node Mobile Agent ("RNMA") 40 and Radio Node Foreign Agent ("RNFA") 42.

In this embodiment, the RN 24 preferably includes a plurality of Radio Node Mobile Agents ("RNMA") 40A, 40B, 40C and 40D implementing the Mobile Agent functionality. RNMA 40A–D are logical entities inside RN 24 that may be embodied as a software process. A RNMA 40A–D will preferably be created for each call connection rather than for each Mobile Node 20. Each Mobile Node 20A–C may have more than one call connection, so a

6

Mobile Node may have more than one corresponding RNMA 40A–D inside the serving RN 24.

Each RN 24 also preferably creates a foreign agent functional entity during boot time, referred to as Radio Node Foreign Agent ("RNFA") 42 in this description. Preferably, the Care-of Address (as defined in RFC 2002) of the RNFA 42 will be the IP address of the RN 24. The RNFA 42 address will also be used as R-P interface 26 data tunneling end point, which will be described in more detail below.

In this embodiment, the PSDN 28 will also create a corresponding home agent functional entity during boot time referred to as a PDSN Home Agent ("PDSNHA") 80. Preferably, the Home Agent Address as defined in RFC2002 of PDSNHA 80 will be the IP address of PSDN 28 used as R-P interface 26 data tunneling end point. It should be understood that the RNFA 42 and PDSNHA 80 functions are only the functional simulation of Mobile IP foreign agent function and home agent function respectively. They are used as foreign agent and home agent function for RNMA registration, not for Mobile Node registration.

Each RNMA 40A–D preferably allocates a Home Agent Address (a 32-bit value) as defined in RFC 2002 that will be unique within each RN 24. Preferably, the Home Agent Address will be assigned during RNMA 40A–D creation. It should be understood that the Home Agent Address used here is preferably different than the permanent home address for a Mobile Node 20. In this embodiment, the Home Agent Address is a value local to R-P interface 26 and is not related to the permanent home address for Mobile Nodes 20A–C. The Home Address will be referred to as "RNHomeAddress" in following description.

Generally, a mobile node 20 initiates a packet data call by sending a call origination message via RN 24. The RN 24 interacts with other cellular network entities providing an air interface 22, such as a 3G CDMA wireless communication network for authenticating the mobile node 20 and setting up a traffic channel with the mobile node 20. After connection, a packet data service option such as RLP synchronization between the mobile station 20 and RN 24 would proceed. If there is no active R-P interface connection 26 for the mobile, a R-P connection 26 between the RN 24 and the PSDN 28 is initiated. The RN 24 preferably initiates the setup of the R-P connection 26 with the PSDN 28 by sending a Registration Request message to the PSDN 28. In addition to the message extensions described in RFC 2002, the Registration Request message should include the CDG-First-Time-Registration Parameter. The PSDN 28 may accept or reject the connection request. If the connection setup request is accepted and the PSDN 28 returns a Registration Reply message with an accept indication, and the packet data call would be connected through the just established R-P connection 26.

A Mobile Node 20 preferably registers with its home agent using a Registration Request message so that its home agent can create or modify a mobility binding for that mobile node (e.g., with a new lifetime) to access the mobile node 20. In the preferred embodiment, each RNMA 40A–B preferably uses Mobile IP signaling to register the allocated RNHomeAddress by sending a Registration Request message to PDSNHA 80 through RNFA 42. Messages preferably use the Mobile IP DP port 434 with control messages sent within a UDP datagram. For example, the initiator of a RP connection 26 selects an available UDP port and sends a Registration Request message to the desired destination PSDN 28. Using the independent implementation of Mobile IP based signaling over UDP, a protocol stack for signaling on the interface can be implemented. Because both RNMA

US 6,963,582 B1

7

40A–B and RNFA 42 are co-located within the same entity
RN 24, Agent Discovery procedure as described in
RFC2002 is not necessary. The RNHomeAddress will be the
assigned to the Home Address field of the Registration
Request message and the PDSN 26 R-P data tunneling
endpoint will be the Home Agent Address within the Reg-
istration Request message. The Registration Request mes-
sage and extensions are described in more detail in RFC
2002.

Typically, the Registration Request message may be
relayed to the home agent by the foreign agent through
which the mobile node 20 is registering, or it may be sent
directly to the home agent in the case in which the mobile
node is registering a co-located care-of address. Accord-
ingly, Mobile IP according to RFC 2002 defines two differ-
ent registration procedures, one via a foreign agent that
relays the registration to the mobile node's home agent, and
one directly with the mobile node's home agent. Several
rules generally determine which of these two registration
procedures apply in any particular circumstance.

For example, if a mobile node 20 is registering a foreign
agent care-of address, the mobile node 20 preferably regis-
ters via that foreign agent. If a mobile node is using a
co-located care-of address, and receives an Agent Adver-
tisement from a foreign agent on the link on which it is using
this care-of address, the mobile node 20 should register via
that foreign agent (or via another foreign agent on this link)
if the 'R' bit is set in the received Agent Advertisement
message. If a mobile node is otherwise using a co-located
care-of address, the mobile node preferably registers directly
with its home agent. If a mobile node 20 has returned to its
home network and is (de)registering with its home agent, the
mobile node should register directly with its home agent.
Both registration procedures involve the exchange of Reg-
istration Request and Registration Reply messages.

When registering via a foreign agent such as in the
preferred embodiment, the registration procedure utilizes the
following four messages:

1. The mobile node sends a Registration Request to the
   prospective foreign agent to begin the registration
   process.
2. The foreign agent processes the Registration Request
   and then relays it to the home agent.
3. The home agent sends a Registration Reply to the
   foreign agent to grant or deny the Request.
4. The foreign agent processes the Registration Reply and
   then relays it to the mobile node to inform it of the
   disposition of its Request.

When the mobile node instead registers directly with its
home agent, the registration procedure requires only the
following two messages:

1. The mobile node sends a Registration Request to the
   home agent.
2. The home agent sends a Registration Reply to the
   mobile node, granting or denying the Request.

The registration messages use the User Datagram Proto-
col ("UDP") as well-known to those skilled in the art. A
nonzero UDP checksum is preferably included in the header,
and is checked by the recipient.

For a mobile node 20 seeking to establish a packet data
call connection to communicate user data with a target host
computer or a packet network, the RN 24 invokes a proxy-
MN function for the mobile node 20 and assigns a MN-
Proxy-ID to the packet data session. The RN 24 registers
each session with the emulated home agent 80 function at
the PDSN 28. The RN 24 places the MN-Proxy-Id in the
Home Address field of the Registration Request message.

8

The structure of the Registration Request and Registration
Reply message is generally as specified in section 3.3 of
RFC 2002. In the preferred embodiment, the IP source
address (IP header) of the care-of address field of the
Registration Request message would be set to the IP address
of the RN 24. The IP destination address of the IP header
would be the address of the PDSN 28 designated for
signaling. The Home Agent Address may be set to zeros.

If the PDSN 28 accepts the connection, it returns a
Registration Reply with an accept indication and the Home
Address or MN-Proxy-ID is the address of the PDSN 28
assigned for the connection. After a successful registration,
both PDSNHA 80 and RNFA 42 preferably use the RNHo-
meAddress inside a GRE header 96 to identify each different
link layer session. This value is preferably referred to within
the GRE header 96 as the Session ID. The GRE header 96
is shown and described in more detail in the description of
FIG. 4.

Thus, the RN 24 and PDSN 28 can use the RN IP Address
and the Home Agent address returned in the Registration
Reply message as the R-P interface connection 26 tunnel
endpoints for the transport of user traffic. Accordingly, the
MN-Proxy ID, RN IP Address and the Home Agent address
form the unique link layer ID for each R-P connection 26.
The RN 24 and PDSN 28 maintains an association of the
mobile IMSI with the link ID for transport of user data over
the R-P connection 26. The individual packet data calls are
differentiated by the session ID field (MN-Proxy-Id) as
implemented in the modified GRE header further described
with reference to the description of FIG. 4.

With the R-P connection 26 in place, PPP frames may
pass data over the connection in both directions using
Generic Routing Encapsulation ("GRE") framing. Gener-
ally, the GRE standard in RFC 1701 specifies a protocol for
performing encapsulation of an arbitrary network layer
protocol over another arbitrary network layer protocol. The
GRE protocol provides a simple, general purpose mecha-
nism which is reduces the problem of encapsulation to a
more manageable state. In the most general case, a system
has a packet, the payload packet that needs to be encapsu-
lated and routed. The payload is first encapsulated in a GRE
packet, which possibly also includes a route. The resulting
GRE packet can then be encapsulated in some other protocol
and then forwarded. The entire encapsulated packet includes
a delivery header, the GRE header 96 and the payload packet
98 itself. FIG. 3 shows the general structure of the IP packets
carrying the GRE-encapsulated PPP frames over the R-P
connection 26. The encapsulated packet includes a media
header 92, IP header 94, modified GRE header 96 and
payload 98.

Referring now to FIG. 4, shown is the modified GRE
header 96 of the preferred embodiment. It should be under-
stood that the GRE header may also include a number of
other optional fields are defined in RFC-1701 such as
Checksum, Offset, and Routing that are not shown for
purposes of clarity of explanation. In the preferred embodi-
ment, the modified GRE header 96 includes a Session ID
100 as Octets 5–8. The Session ID 100 value is preferably
used during user link data transfer by PDSN 80 and RN 24
to multiplex and de-multiplex data from different link layer
sessions. The link layer session mapping has been success-
fully established after a successful RNMA registration.
Regarding the field of the GRE header 96 that is used as the
Session ID 100 with RNHomeAddress, it can be left up to
the final standard selection.

The general GRE header 96 specified in RFC 1701 is
modified so that the Key field is used to represent the

US 6,963,582 B1

9
10

Session Id 100 containing the MN-Proxy-Id for the call connection. The flags and other fields in the GRE header 96 shown in FIG. 4 would be encoded as follows:

C (Checksum Present) '0'
R (Routing Present) '0'
K (Key Present) '1'
S (Sequence Number Present) '1'
s (Strict Source Routing Present) '0'
Recur (Recursion Control) '0s'
Flags '0s'
Vers (Version Number) '0s'
Protocol Type (PPP for Version 1) 'TBD'

In the preferred embodiment, the Checksum Present bit is set to 0, indicating no checksum is present. If the Checksum Present bit is set to 1, then the Checksum field is present and contains valid information. Typically, if either the Checksum Present bit or the Routing Present bit are set, BOTH the Checksum and Offset fields are present in the GRE packet.

Preferably, the Routing Present bit is set to 0, indicating no Routing field is present. If the Routing Present bit is set to 1, then it indicates that the Offset and Routing fields are present and contain valid information. If either the Checksum Present bit or the Routing Present bit are set, BOTH the Checksum and Offset fields are present in the GRE packet.

Key Present (K, Bit 2)

In the exemplary embodiment, the Key Present bit is set to 1, indicating that the Key field is present in the GRE header 96. In this embodiment, the Key is substituted as the Session ID 100 as described above. Preferably, the Sequence Number Present bit is set to 1, indicating that the Sequence Number Present bit is present. Otherwise, the Sequence Number field is not present in the GRE header 96.

In addition, the Strict Source Route bit is preferably set to 0, indicating no Strict Source Route is present. It is recommended that this bit only be set to 1 if all of the Routing Information consists of Strict Source. Preferably, the three bits of the Recursion Control are set to 000, indicating no additional encapsulations are possible.

The Flags and Version (2 octets) encode the GRE flags in the first two octets. Bit 0 is the most significant bit, bit 15 is the least significant bit. Bits 13 through 15 are reserved for the Version field. Bits 5 through 12 are reserved for future use and should be transmitted as zero.

In the preferred embodiment, the Version Number bits (bits 13-15) are set to 0. The Protocol Type field (2 octets) contains the protocol type of the payload packet. In general, the value will be the PPP protocol type field for the payload. Currently defined protocol types are listed in RFC 1701. Additional values may be defined in other documents.

In this embodiment, the same value RNHomeAddress associating the Home Address in Home Address field of Mobile IP registration message with the Session ID 100 is also used in the GRE header 96. During registration, the GRE flag is set to force the use of Mobile IP GRE tunneling and the reverse tunneling flag is set to force data flow in both directions through PDSN 28. The logical entities Mobile Agent and foreign agent are created within RN 24 and the logical entity home agent described above is created within PDSN 28.

The R-P connection 26 is then used for the transport of user data carried on the packet data session preferably using GRE encapsulated PPP packets in the preferred embodiment. PPP frames are carried between the RN 24 and PDSN 28 encapsulated in modified GRE packets, which in turn are carried over IP. The PDSN 28 accepts the GRE frames, strips the GRE, and process them as normal incoming frames for

the appropriate interface and protocol. In the other direction, the PDSN 28 encapsulates the PPP frames in GRE and the RN 24 strips the GRE before passing the frames over to the upper layers. At this point, the connectivity would be a point-to-point PPP session between the mobile user 20 and the PDSN 28.

According to this preferred embodiment, the RN 24 IP address and the Home Agent Address is used in the source address and destination address fields of the IP header 94 used with the GRE packet 90 of FIG. 4. A new Session ID field containing the MN-Proxy-ID in the modified GRE header 96 would indicate which packet data session a particular PPP packet belongs to. In this manner, several R-P connections 26 would be multiplexed on the same IP connection (RN IP Address and PDSN Home Agent Address) between an RN-PDSN pair.

The PPP protocol generally receives packets in sequence. The RN 24 and PDSN 28 preferably set the Session Id to the MN-Proxy-Id for the call. The Sequence Numbers would be per packet sequence numbers. Both the RN 24 and PDSN 28 set the Sequence Number to zero at packet session startup. Each packet sent during a given session is assigned the next consecutive sequence number. If packets arriving at the RN or RDSN lose their sequencing across the R-P network, the receiving entity may attempt to re-sequence the packet before delivery to the PPP layer. For example, if packet number 4 & 5 arrive before packet 3, the receiving entity may wait for packet 3 before delivering packets 4 & 5 to the link layer (PPP layer). Failing arrival of packet 3, packets 4 and 5 would be delivered to the link layer and late arriving packet 3 would be discarded.

Normally, a packet network system which is forwarding delivery layer packets will not differentiate GRE packets from other packets in any way. However, a GRE packet may be received by a system. In this case, the system should use some delivery-specific means to determine that this is a GRE packet. Once this is determined, the Key, Sequence Number and Checksum fields if they contain valid information as indicated by the corresponding flags may be checked. If the Routing Present bit is set to 1, then the Address Family field should be checked to determine the semantics and use of the SRE Length, SRE Offset and Routing Information fields. The exact semantics for processing a SRE for each Address Family is defined in other protocols and documents well known to those skilled in the art.

Once all SREs have been processed, then the source route is complete, the GRE header should be removed, the payload's TTL MUST be decremented (if one exists) and the payload packet should be forwarded as a normal packet. The exact forwarding method can depend on the Protocol Type field as described above.

The present embodiments provide an efficient new interface between wireless radio networks and packet switching networks to simplify mobility management. The interface combines a modified mobile IP protocol with a modified GRE signaling to eliminate the necessity of a separate tunneling ID and Session ID as used in other protocols. Preferably, the proposed protocol is independent of the details of the physical and link layer technologies over which the R-P connection is established. Each call connection is uniquely identified by the pair value (Home Address, Care-of Address). The Mobile IP/GRE tunneling is connectionless although it carries connection-oriented Link Layer session such as PPP. Eliminated is the need for a separate tunneling ID and Session Id as used in other protocols.

It should be understood that the programs, processes, methods and systems described herein are not related or

US 6,963,582 B1

**11**

limited to any particular type of computer or network system (hardware or software), unless indicated otherwise. Various types of general purpose or specialized computer systems may be used with or perform operations in accordance with the teachings described herein.

In view of the wide variety of embodiments to which the principles of the present invention can be applied, it should be understood that the illustrated embodiments are exemplary only. The illustrated embodiments should not be taken as limiting the scope of the present invention.

For example, the steps of the flow diagrams may be taken in sequences other than those described, and more or fewer elements may be used in the block diagrams. While various elements of the preferred embodiments have been described as being implemented in software, in other embodiments hardware or firmware implementations may alternatively be used, and vice-versa.

The claims should not be read as limited to the described order or elements unless stated to that effect. Therefore, all embodiments that come within the scope and spirit of the following claims and equivalents thereto are claimed.

I claim:

1. A system for providing a mobile wireless communication network to access a destination comprising:

an air interface utilizing a mobile networking protocol to provide mobile wireless communication service;

a packet data network utilizing a modified generic routing encapsulation protocol modified to accept an address as a session in the key field of a GRE header ID to provide a fixed network communication service for communication from the air interface, wherein the address comprises a RNHomeAddress; and

a tunnel connection to transport communication from the air interface to the destination through the packet data network,

**12**

wherein the session ID identifies a link layer session independent of a tunnel ID.

2. The system of claim 1 further comprising:

an interface between the air interface and the packet data network, wherein the interface encapsulates communications from the air interface.

3. The system of claim 1 wherein the tunnel connection carries communications in PPP frames.

4. The system of claim 3 wherein the PPP frames are carried with a modified GRE framing.

5. The system of claim 1 wherein the mobile networking protocol utilized by the air interface comprises a 3G CDMA interface.

6. A system for providing mobile Internet Protocol network interface for a mobile node, comprising:

an air interface providing a network for the mobile node;

a modified mobile IP protocol providing a mobile network interface for the air interface; and

a modified Generic Routing Encapsulation protocol providing a packet network protocol, wherein the modified Generic Routing Encapsulation uses the key field of a GRE header to include a session id for the call connection and wherein the session ID identifies a link layer session independent of a tunnel ID.

7. The system of claim 6 wherein the session ID comprises a RNHomeAddress.

8. The system of claim 7 further comprising a Radio Node, the Radio Node comprising a RNHomeAddress wherein the RNHomeAddress is unique within the Radio Node.

* * * * *

Exhibit D

US006765900B2

(12) **United States Patent**
Peirce, Jr. et al.

(10) **Patent No.:     US 6,765,900 B2**
(45) **Date of Patent:         Jul. 20, 2004**

(54) **VIRTUAL HOME AGENT SERVICE USING SOFTWARE-REPLICATED HOME AGENTS**

(75) Inventors: **Kenneth L. Peirce, Jr.**, Barrington, IL (US); **Matthew Harper**, Arlington Heights, IL (US); **Timothy G. Mortsolf**, Lisle, IL (US); **Yingchun Xu**, Buffalo Grove, IL (US); **Richard J. Dynarski**, Glen Ellyn, IL (US)

(73) Assignee: **UTStarcom, Inc.**, Alameda, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/346,897**

(22) Filed: **Jan. 16, 2003**

(65) **Prior Publication Data**

US 2003/0128689 A1 Jul. 10, 2003

**Related U.S. Application Data**

(63) Continuation of application No. 09/248,617, filed on Feb. 25, 1999, now Pat. No. 6,560,217.

(51) Int. Cl.[7] ................................................ **H04L 12/28**
(52) U.S. Cl. ........................................ 370/351; 709/229
(58) Field of Search ................................ 370/351, 352, 370/353, 354, 355, 356, 468, 406, 401, 402, 230, 229, 524; 703/229, 230, 225, 224

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,864,669 | A | * | 1/1999 | Osterman ................. 709/203 |
| 6,195,705 | B1 | * | 2/2001 | Leung ...................... 370/331 |
| 6,272,129 | B1 | * | 8/2001 | Dynarski .................. 370/356 |
| 6,301,618 | B1 | * | 10/2001 | Sitaraman ................. 709/227 |
| 6,366,561 | B1 | * | 4/2002 | Bender ..................... 370/238 |
| 6,377,982 | B1 | * | 4/2002 | Rai .......................... 709/217 |
| 6,385,653 | B1 | * | 5/2002 | Sitaraman ................. 709/230 |
| 6,400,722 | B1 | * | 6/2002 | Chuah ...................... 370/401 |
| 6,430,698 | B1 | * | 8/2002 | Khalil ........................ 714/4 |
| 6,560,217 | B1 | * | 5/2003 | Peirce et al. .............. 370/351 |
| 6,678,828 | B1 | * | 1/2004 | Pham et al. ............... 713/201 |

OTHER PUBLICATIONS

Jue, J.P., et al., *"Design and Analysis of A Replicated Server Architecture for Supporting IP Host Mobility"*, Mobile Computing and Communications Review, vol. 2, No. 3, pp. 16–23, (Jul. 1998).
Malkin, Gary Scott, XP–002084438, *"Dual–in Virtual Private Networks Using Layer 3 Tunneling"* proceedings of the conference on local computer networks, pp. 555–561, IEEE, (Nov. 2, 1997).
PCT International Search Report for 3Com Corporation, PCT/US 00/03361, dated Aug. 2, 2000.
C. Perkins, *Request for Comments* (RFC) 2002 (Oct. 1996).
Charles E. Perkins, *Mobile IP Design Principles and Practices*, Addison–Wesley Wireless Communications Series, Chapter 4, pp. 58–93 (1998).

* cited by examiner

*Primary Examiner*—Douglas Olms
*Assistant Examiner*—Ricardo M. Pizarro
(74) *Attorney, Agent, or Firm*—McDonnell Boehnen Hulbert & Berghoff

(57)        **ABSTRACT**

Multiple home agents for a home agent service provider network are implemented in a single computing platform in software as multiple virtual home agents. Each home agent is assigned or dedicated to a single virtual private network. Any number of home agents can be realized in the computing platform by multiple instantiations of a home agent program or code, and by providing unique IP addresses for each instantiation. Each home agent runs independently, and is independently configured and managed by the subscriber of the virtual private network service, freeing the service provider of having to manage and supervise low level processing tasks and customization features that the subscribers may want. In a representative embodiment, the computing platform comprises a router having a general purpose computing platform.

**10 Claims, 3 Drawing Sheets**





FIG. 1



FIG. 2

**FIG. 3**



US 6,765,900 B2

1

**VIRTUAL HOME AGENT SERVICE USING SOFTWARE-REPLICATED HOME AGENTS**

CROSS-REFERENCE TO RELATED APPLICATIONS

This is a continuation of application Ser. No. 09/248,617, filed on Feb. 25, 1999, now U.S. Pat. No. 6,560,217.

BACKGROUND OF THE INVENTION

A. Field of the Invention

This invention relates generally to the subject of mobile Internet Protocol ("IP") data networking. The invention also relates to the subject of virtual private networking.

B. Description of Related Art

A virtual private network ("VPN") is a service provided by a telecommunications carrier (such as Sprint or AT&T) in which their public network resources are logically organized by the company but managed by the customer, in a manner to provide capabilities similar to those offered by private networks. The concept can be applied to public packet switched networks, e.g., Internet Protocol or Internet Packet eXchange ("IPX") networks. Essentially, a virtual private network is equivalent to a private data network defined logically within a public network, offering the user the economies of scale of the public network, but the control and management capabilities that are found in a private network.

Where a public IP/IPX network supports virtual private networks, then the elements of the network must be configured to handle data traffic for multiple virtual private networks at the same time. For example, a router in the network would have to handle packets for each virtual private network individually, since each virtual private network is managed separately and will typically have its own unique addressing and routing schemes.

Public packet switched networks can be used to carry traffic to and from a mobile communications device, such as a laptop computer or personal digital assistant equipped with a cellular telephone modem. The basic architecture of mobile IP data networking is known in the art and described in several publications, including the Request for Comments document RFC 2002 (1996) and in the textbook of Charles E. Perkins, *Mobile IP Design Principles and Practices,* Addison-Wesley Wireless Communications Series (1998), the contents of both of which are incorporated by reference herein.

Basically, in Mobile IP communication, a wireless mobile node communicates with a terminal on an IP network by means of a foreign agent and a home agent. Typically, foreign agent functionality is incorporated into a router or network access server chassis located on a mobile node's visited network. The foreign agent provides routing services for the mobile node while it is registered with the foreign agent. The foreign agent de-tunnels and delivers datagrams to the mobile node that were tunneled by the mobile node's home agent. The home agent is a router on a mobile node's home network that tunnels datagrams for delivery to the mobile node via the foreign agent when the mobile node is away from home. The home agent maintains current location information for the mobile node, through a variety of possible mechanisms, such as described in the patent application of Richard J. Dynarski, et al., "Dynamic Allocation of Wireless Mobile Nodes Over an Internet Protocol (IP) Network", Ser. No. 09/233,381, which is incorporated by reference herein. When multiple home agents are handling calls for multiple mobile nodes simultaneously, the home

2

agents are providing, in essence, a service analogous to virtual private network services. Each mobile node is typically associated with a separate home network and the routing path from that home network, through the home agent, to the foreign agent and mobile node is like a virtual private network for the mobile node.

The known prior art for providing Mobile IP networking services has embraced the concept of a single home agent for a given network. However, some larger scale providers of Mobile IP networking services may require multiple home agents on their networks. One possible approach is to provide multiple home agents in separate chassis. Another approach is to provide a single home agent, but design the home agent such that it has an internal architecture to support multiple networks (e.g., multiple virtual private networks). This approach is not considered very attractive, in that management of the home agent would be cumbersome. Furthermore, the home agent would not be particularly fault tolerant, in that any mechanical or software problem in the home agent would potentially affect a large number of virtual private networks.

The present invention provides an efficient, easy to manage method for providing a plurality of home agents on a network. All of the home agents are implemented in a single computing platform. That is, rather than attempting to use a single home agent with an internal architecture to support multiple networks, multiple real home agents, each comprising an instantiation of a home agent software program or code, are implemented in the computing platform. Each home agent is dedicated to performing home agent tasks for a single virtual private network. Each home agent is given its own unique address in the computing platform, thereby providing a mechanism for isolating the processing for each home agent from the other processing. The result is an easily managed, scaleable, and fault tolerant mechanism for providing home agent services, particular in high density and large scale implementations of mobile IP.

These and other features of the present invention will be more apparent from the following detailed description of presently preferred embodiment.

SUMMARY OF THE INVENTION

A method for providing home agent services for a plurality of mobile communications devices is provided. The method may be practiced in the context of virtual private network environment, or otherwise. The method makes use of a computing platform (such as a general purpose computer, router, or network access server) that receives a plurality of packets from a first network. The computing platform is configured as a master home agent device, which implements a plurality of real home agents as distinct processing threads in software. For example, the plurality of home agents may comprise multiple instantiations or replications of a home agent software program or process. The packets that are incoming into the computing platform are directed to the home agent that is associated with the packet. This is preferably accomplished by providing each software-replicated home agent with a unique IP address for purposes of directing the packets to the proper home agent.

The packets are processed in the plurality of home agents in accordance with the requirements of RFC 2002 and mobile IP protocols for home agents, or some lesser set of home agent functionality for mobile IP networking if RFC 2002 is not fully supported. For example, the packets may comprise registration request messages from the mobile communications devices. The home agent would then either

3

process the registration request message itself or use an Accounting, Authorization and Authentication (AAA) server to perform some of the processing, such as authentication processing. As another example, the packets may be data packets to be forwarded from the home agent to the mobile communications device. After processing the packet in the home agent, the packets are forwarded onto a second network for transmission to a destination for the packets.

Preferably, in the above method each of the home agents comprise an instantiation of a home agent software program implemented in the computing platform. Further, each instantiation of the home agent software program is given a unique address in the routing chassis. This keeps the processing for each home agent separate from each other. This also makes the system more fault tolerant and more easily managed by known management protocols (SNMP, etc.).

The computing platform or chassis that the above method is implemented may comprise a router, a general purpose computer or any other suitable network element. The main requirement is that it would have a central processing unit and an operating system capable of implementing multiple software-replicated home agents, maintaining separate addresses for each of them, and having the necessary hardware and software interfaces to other communications elements (such as the networks that are used, and possibly an AAA server), in order to provide the desired home agent service for a plurality of mobile communications devices.

The invention is particularly suitable for use in a virtual private network context. The chassis providing the VPN/home agent services would typically be managed by a wireless service provider. Each home agent would be managed separately either by the service provider, or more preferably by the user of that home agent. The exact manner in which the individual home agents would be managed would typically be worked out as a contractual matter between the provider of the chassis and the company it is providing service to. In any event, the segregation of each home agent into separate address space in the computing platform or chassis will allow each home agent to be independently managed.

In another aspect of the invention, a routing chassis processing packets for a plurality of mobile communications devices is provided. The routing chassis comprises an interface to a first network, two or more software-replicated home agents that are running on a computing platform in the routing chassis, and a means (such as a IP stack implemented in a operating system running on the computing platform, or the equivalent) for demultiplexing a plurality of packets arriving from the first network at the first network interface and for forwarding the packets to the plurality of home agents in accordance with addresses contained in the packets. Preferably, each of the home agents comprises an instantiation of a home agent software program.

In a representative embodiment, the routing chassis comprises two or more interfaces to a second network such as wide area network, wherein each of the interfaces to the second network is associated with one of the home agents. The wide area network may for example provide long haul delivery of packets from the mobile communications device to the device's home network. Furthermore, each of the home agents may be associated with a virtual private network.

In yet another aspect of the invention, a method of handing a registration request from a mobile communications device is provided. The method comprises the steps of implementing a master home agent in a communications

4

chassis such as a router or general-purpose computer. The master home agent comprises a plurality of software-replicated home agents. A registration request message is received from the mobile communications device at the communications chassis and forwarded to one of the plurality of software-replicated home agents. The forwarding is accomplished by reference to an address in the registration request, with each of the software replicated home agents having a unique address.

The software-replicated home agent generates a registration request authentication message and transmits the registration request authentication message to an AAA server. The AAA server either authenticates or does not authenticate the mobile communications device and sends an authentication reply message back to the home agent. The reply is forwarded from the communications chassis to the mobile communications device.

BRIEF DESCRIPTION OF THE DRAWINGS

In the following description, reference will be made to the appended drawings, wherein like reference numbers refer to like elements in the various views, and in which:

FIG. 1 is an illustration of a virtual private network architecture for a plurality of mobile nodes or communications devices, in which home agent functionality for a plurality of networks is spread out among several home agents, each comprising a separate computing platform;

FIG. 2 is an illustration of a virtual private network architecture for a plurality of mobile nodes, in which the functionality of all the home agents of FIG. 1 is combined into a single computing platform, functioning as a router, which is designated a "master home agent." The master home agent implements a plurality of software-replicated home agents.

FIG. 3 is an illustration of the software architecture for the computing platform comprising the master home agent of FIG. 2, in which up to n software replicated home agents are implemented, each assigned or dedicated to one virtual private network.

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT OF THE INVENTION

Overview of Representative Virtual Private Network System for Mobile IP Nodes

Referring now to FIG. 1, a basic architecture for providing IP networking services for a group of mobile nodes is shown schematically. In the example of FIG. 1, three wireless users, designated 10A, 10B and 10C, send and receive IP packets with host computers on their home networks 11A, 11B and 11C, respectively. The wireless users or nodes send and receive IP packets by means of a radio access network 12 (the details of which are not important) and make use of a plurality of network access servers 13A, 13B, 13C, 13D that function as foreign agents for the wireless devices. The foreign agents 13A . . . 13D are on a network maintained by a provider of mobile IP service, such as a wireless communications company or other suitable entity. The network access servers 13A . . . 13D are of the general type described in the patent of Dale M. Walsh et al., U.S. Pat. No. 5,528,595 and assigned to the assignee of the present invention. Such network access servers are available from companies such as 3Com Corporation, Ascend Communications, and Lucent Technologies. Basically, the network access servers 13A . . . 13D implement foreign agent functions as specified by RFC 2002 and provide access to an IP wide area network such as the Internet 16.

US 6,765,900 B2

5

IP packets for the mobile devices are tunneled to the respective foreign agent by a home agent in accordance with the Mobile IP protocol. In the example of FIG. 1, the home agent service provider maintains a network 14 including a local area network 17 in which multiple real home agents 18 are located. In the example of FIG. 1, four such home agents 18A . . . 18D are provided. Each home agent comprises a router with an interface to the local area network and a wide area network interface that connects the home agent to a backhaul network 19 (which may be an Asynchronous Transfer Mode network, frame relay network, or other type of network). The backhaul network 19 is in turn connected via suitable routers to the individual home networks 11A, 11B and 11C of the users 10A, 10B and 10C, respectively.

While the architecture of FIG. 1, and specifically the multiple home agent implementation with multiple discrete chassis is certainly one possible solution for a large scale virtual private network system for multiple mobile IP users, it can be improved upon. With reference to FIG. 2, we propose consolidating the home agents 18A . . . 18D (or more of such home agents) into a single chassis, designated the master home agent 26. The master home agent 26 serves all of the mobile users 10A, 10B, 10C, etc. and all the virtual private networks that are set up between the mobile users and their home networks 11A, 11B and 11C. Rather than attempt to structure the master home agent 26 with an internal software architecture to support multiple networks within a single home agent process, the present invention provides for implementing, in the master home agent 26, multiple real, software-replicated home agents, each comprising an instantiation of a home agent software process or program. This will be described in further detail in conjunction with FIG. 3.

The advantages of multiple real software-based home agents within a single chassis are many. The ease of management, scalability, fault-tolerance, and ease of implementation are perhaps the most striking. Thus, the solution of FIG. 2 is considered a substantial improvement over the alternative organization scheme of FIG. 1.

Furthermore, in another aspect of the invention, the master home agent 26 takes advantage of an AAA server 28 on the local area network 17 for purposes of registration request authentication processing. This off-loads some of the processing and memory requirements from the master home agent and further facilitates management, accounting and authentication issues for the provider of the virtual private network and mobile IP services. This feature will be explained further below.

Software Architecture of Virtual Home Agent Platform

The master home agent 26 of FIG. 2 consists of a computing platform such as a general purpose computer or router, which is set up with a software architecture and hardware interfaces to function as an home agent for the Mobile IP protocol. As such, it consists of a central processing unit, memory, local and wide area network interface cards and drivers and other hardware (not shown) that will be apparent to a person skilled in the art in view of the present discussion and known router platforms. The details of the hardware are not particularly important. For the purposes of the present invention, the software architecture is the pertinent consideration, and such software architecture is illustrated in FIG. 3.

The basic concept of the multiple, real, software-replicated home agent is that the master home agent 26 is a computing platform that implements, via software, multiple home agent process or threads 62A, 62B, . . . 62N. Each home agent 62 is an instantiation of a home agent program

6

or code. Each home agent process is responsible for processing only a subset of the hardware interfaces within the complete system, one software replicated home agent designated to one virtual private network, one LAN interface and one wide area network interface.

Each software replicated home agent 62A, 62B . . . 62N is assigned a unique IP address which is used by the operating system (OS) IP stack 52 to demultiplex packets received on the LAN interface(s) 54. Each home agent process is also connected to a set of Point-Point WAN interfaces 64, which could be realized by Frame Relay, Asynchronous Transfer Mode (ATM) or any other Point-Point WAN Interface.

This structure allows the master home agent 26 to instantiate any number of multiple different home agents, each one isolated for the other by the operating system in the master home agent. This allows each home agent 62 to be configured differently, and provide different types of home agent services and configurations on a per-VPN basis. Each of the individual home agent instantiations 62A, 62B, . . . 62N are not aware of the different multiple virtual private networks within the master home agent platform; rather, they are simply handling registration requests, authentication and other functions according to their internal configuration.

Additionally, the software architecture of FIG. 3 is much more fault tolerant than prior art approaches. This stems from the feature of separating the individual home agents into different address spaces, and thus different processes. If any one home agent misbehaves, the problem can be fixed or isolated, without affecting any of the other home agents or virtual private networks that are currently active.

The master home agent computing platform of FIGS. 2 and 3 has a LAN interface 54 with an address on the IP/IPX network 14 of the form $X_1.X_2.X_3.0$, where $X_i$ is some 3 digit number. The LAN interface 54 receives packets from the IP/IPX network 14 that are designated or belong to any arbitrary number of virtual private networks and home agents. The particular virtual private network to which the packet belongs is determined by an IP address contained in the packet, as discussed below.

The LAN interface 54 forwards packets from the virtual home agent service provider network 14 to an operating system OS IP stack 52 for the master home agent. The operating system in the chassis or master home agent 26 will typically support various communications features, such as an IP protocol stack or software module, of which persons skilled in the art are familiar. The incoming packet from the IP/IPX network 14 will have an IP address associated with one of N possible tunnels, such as $X_1.X_2.X_3.1$ (tun0 in FIG. 3). The OP IP stack 52 uses this IP address to demultiplex the packet and select the proper home agent process 62 to process the packet.

For a packet with an address of $X_1.X_2.X_3.1$, the packet is routed to home agent process 62A by a sorting module 56. The sorting module 56 sorts the packets according to the home agent address in the packet and forwards the packet to the specified home agent process 62A, 62B, . . . 62N (each of which is associated with a unique address). The home agent process 62A acts as a home agent for virtual private network no. 1 in the present example. The home agent process 62A serves mobile node A (10A) in FIG. 2 and mobile node A's home network 11A.

This sorting process further demultiplexes the packet using the information in the IP tunnel header to decide where to route the packet internal to the home agent process 62A itself. This step allows the home agent process 62A to terminate certain types of data packets, such as Network

US 6,765,900 B2

7

Management packets (using known management protocols such as SNMP, CMIP, etc.), within the individual processes. This step removes the tunneled packet header leaving the original packet to be forwarded/processed.

When the packet is sent to the home agent process 62A, the home agent functionality as specified in RFC 2002 is performed. The packet is forwarded to a wide area network interface WAN #0 in the WAN interface module 64. WAN #0 interface is an interface that is assigned or dedicated to the VPN #1 home agent 62A. The packet is then sent out via the WAN#0 interface for transmission on backhaul network 19 to a terminal on the customer's network 11A.

For traffic going in the opposite direction, an un-tunneled IP packet arrives on WAN #0 interface, and is forwarded the home agent process 62A. The home agent process 62A uses a routing table to determine which foreign agent (e.g., 13A or 13B of FIG. 2) to forward the packet to. The routing table is built from routing packets its receives on either its WAN interface or its tunX interface. It uses this information to build a tunneled IP packet to send via the OS IP stack 52. The OS IP stack 52 uses the information in the IP header to route the packet to the designated foreign agent, e.g., 13A of FIG. 2.

While the process has been described for one home agent 62A for one virtual private network, it will be appreciated that the process is going on in parallel for multiple virtual private networks in the other home agents 62B, . . . 62N in the master home agent 26. In particular, multiple software-replicated home agents 62A–62N may be instantiated by the operating system at the same time, each one dedicated to its own virtual private network.

Furthermore, since each home agent 62A, 62B . . . 62N is associated with a unique IP address, when the packets are forwarded to the various home agents processes, the information in the IP tunnel header will allow each home agent to terminate management packets, independently of each other, and thus allow each home agent to be separately managed by the VPN subscriber. The management of the separate routing and home agent processes is completely segregated in the master home agent chassis 26 along VPN and home agent customer boundaries. A user of the VPN and its associated home agent can only access and see its own home agent configuration. Additionally, the structure and organization of the master home agent and the network topology of the home agent service provider is completely hidden. This allows the users of the home agent service to be given access to their own home agent process without the need to implement special software to prevent them from accessing or changing another instantiation of a home agent. The entity providing home agent services does not have to be involved in configuration and management of each home agent, as it is left up to the customer. As such, the present invention presents to Mobile IP providers an attractive, flexible and easily managed means for providing home agents for its Mobile IP customers.

From the foregoing, it will be appreciated that we have described a method of providing home agent services for virtual private networks, comprising the steps of:
    providing a computing platform (e.g., master home agent 26 or a router in the home agent service provider network) for receiving a plurality of packets from a first network (e.g., IP Network 14), with the plurality of packets associated with a plurality of different virtual private networks or mobile communications devices;
    implementing a plurality of home agents 62A . . . 62N in the computing platform;
    directing the packets within the computing platform 26 to the home agents 62A, 62B etc. associated with the packets;

8

    processing the packets in the plurality of home agents; and
    forwarding the packets from the computing platform 26 onto a second network (e.g., backhaul network 19) for transmission to the destinations for the packets.

Preferably, each of the home agents comprise a separate instantiation of a home agent software program or code implemented in the computing platform. Further, preferably each home agent is assigned or associated with a unique IP address.

While the multiple software home agents are implemented in a router comprising a master home agent in the illustrated embodiment, it is possible to implement the invention in another type of computing platform.

It will also be appreciated that we have described a processing platform for a plurality of packets associated with a plurality of virtual private networks. The processing or computing platform could be implemented in a general-purpose computer configured with hardware interfaces and suitable software to function as a virtual home agent router, or other suitable device. The processing platform comprises a suitable central processing unit and an operating system program implemented by the central processing unit (e.g., Windows NT). The operating system has as a feature an Internet Protocol (IP) stack. A plurality of home agents comprising multiple instantiations of a home agent program 62A, 62B, . . . (FIG. 3) are implemented in the computing platform. Each home agent is associated with one of the virtual private networks, and each home agent has or is associated with a unique IP address. A plurality of network interfaces 64 (FIG. 3) are provided in the computing platform that receive the packets from the home agents. The IP stack 52 directs the packets to the home agents 62A, 62B, etc. assigned to the home agents for processing, and the home agents forward the packets to the network interfaces 64 for transmission to a destination (e.g., a RADIUS server, foreign, agent, host computer, etc.).

In a preferred embodiment, each of the home agents are separately configured by a user subscribing to its associated virtual private network service, by means such as SNMP or other management packets that are terminated in the home agent processes 62A, 62B, etc.

Further, it will be appreciated that any arbitrary number of software instantiated home agents can be implemented in the computing platform. For example, more than 20 distinct instantiations of the home agent program could be running at one time, each one serving a different virtual private network.

Referring now to FIG. 2, the use of the AAA server 28 in performing registration request authentication functions for a plurality of mobile nodes will be described. For a mobile node to communicate with its peer in the mobile IP protocol, it must be registered with the foreign agent. During the registration process, the foreign agent (e.g., one of the network access servers 13 of FIG. 2) sends a registration request message to the home agent for the mobile device. To determine whether the mobile node should be registered or not, the home agent needs to perform an authentication function for the mobile node. This is to insure that only current subscribers are allowed IP network access, and to deny such access where the mobile node has not paid their bill, is no longer a current subscriber, or is otherwise unauthorized to access the service. While the registration request authentication function could be performed entirely within the computing platform in the master home agent chassis, we prefer to have the authentication function carried out in the AAA server 28. More specifically, information

US 6,765,900 B2

9

from the registration request (such as the mobile node's IMSI or ESN number, that is, serial number type of information uniquely identifying the device) is forwarded to the AAA server. The AAA server determines from this number whether the mobile node that is seeking registration is authorized or not. The AAA in turn sends a reply indicating the status of the registration request authentication back to the home agent 62 (that is, back to the particular instantiation of the home agent program that sent the authentication request to the AAA server). The home agent then sends back a reply to the registration request message back to the foreign agent, which in turn forwards it to the mobile node. If the registration request is denied, an error code may be included in the reply. Further details on this process are described in the patent application of Richard J. Dynarski, et al., "RADIUS-based Mobile Internet Protocol (IP) address-to-Mobile Identification Number Mapping for Wireless Communication", Ser. No. 09/233,401 filed Jan. 19, 1999, the contents of which are fully incorporated by reference herein.

Persons skilled in the art will appreciate that various modifications and alterations from the presently preferred embodiment can be made without departure from the true scope and spirit of the invention. This true scope and spirit is defined by the appended claims, to be interpreted in light of the foregoing.

We claim:

1. A method of providing home agent services, comprising the steps of:
   providing a single computing platform for receiving a plurality of packets from a first network;
   implementing a plurality of home agents in software in said single computing platform;
   directing said packets within said single computing platform to respective home agents of the plurality of home agents associated with said packets;
   processing said packets in said plurality of home agents; and

10

   forwarding said packets from said computing platform onto a second network for transmission to respective destinations for said packets.

2. The method of claim 1, wherein said single computing platform comprises a router.

3. The method of claim 1, wherein said single computing platform comprises a general-purpose computer.

4. The method of claim 1, wherein each home agent of said plurality of home agents is assigned a unique IP address.

5. A routing chassis for processing packets for a plurality of mobile communications devices, comprising:
   an interface to a first network; a single computing platform including software and hardware, said software implementing two or more software-replicated home agents; and
   a means for demultiplexing a plurality of packets arriving from said first network at said first network interface and for forwarding said packets to said plurality of home agents in accordance with addresses contained in said packets.

6. The routing chassis of claim 5, wherein each of said home agents comprise an instantiation of a home agent software program.

7. The routing chassis of claim 5, wherein each of said home agents is assigned a unique IP address.

8. The routing chassis of claim 5, wherein each of said home agents processes registration request messages for a plurality of mobile devices.

9. The routing chassis of claim 5, wherein each of said home agents are associated with a virtual private network.

10. The routing chassis of claim 5, wherein said chassis is located on a local area network and wherein said local area network comprises an AAA server, said AAA server cooperating with said chassis in processing a registration request message from one of said mobile communications devices.

* * * * *

Exhibit E



US006684256B1

(12) **United States Patent**     (10) **Patent No.:**  US 6,684,256 B1
Warrier et al.                    (45) **Date of Patent:**      Jan. 27, 2004

(54) **ROUTING METHOD FOR MOBILE WIRELESS NODES HAVING OVERLAPPING INTERNET PROTOCOL HOME ADDRESSES**

(75) Inventors: **Chandra Warrier**, Schaumburg, IL (US); **Yingchun Xu**, Buffalo Grove, IL (US)

(73) Assignee: **UTStarcom, Inc.**, Alameda, CA (US)

( * ) Notice:  Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/491,751**

(22) Filed:  **Jan. 27, 2000**

(51) Int. Cl.$^7$ ................................................ G06F 15/16
(52) U.S. Cl. ........................ 709/238; 702/245; 702/249
(58) Field of Search ............................... 709/217, 218, 709/223, 225, 226, 229, 238, 245, 249; 370/338, 349, 389, 392, 401; 455/433

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,528,595 | A | | 6/1996 | Walsh et al. ............. 370/85.13 |
| 6,160,804 | A | * | 12/2000 | Ahmed et al. ............. 370/349 |
| 6,163,843 | A | * | 12/2000 | Inoue et al. ............... 713/201 |
| 6,167,513 | A | * | 12/2000 | Inoue et al. ............... 713/150 |
| 6,195,705 | B1 | * | 2/2001 | Leung ........................ 709/245 |
| 6,240,089 | B1 | * | 5/2001 | Okanoue et al. ........... 370/390 |
| 6,374,108 | B1 | * | 4/2002 | Jakobsen et al. .......... 455/432 |
| 6,407,988 | B1 | * | 6/2002 | Agrahram et al. ......... 370/328 |
| 6,424,639 | B1 | * | 7/2002 | Lioy et al. ................. 370/338 |
| 6,430,698 | B1 | * | 8/2002 | Khalil et al. ................. 714/4 |
| 6,445,922 | B1 | * | 9/2002 | Hiller et al. ............... 455/433 |

| | | | | |
|---|---|---|---|---|
| 6,452,920 | B1 | * | 9/2002 | Comstock ................... 370/349 |
| 6,466,571 | B1 | * | 10/2002 | Dynarski et al. ........... 370/352 |
| 6,466,964 | B1 | * | 10/2002 | Leung et al. ............... 709/202 |
| 6,501,746 | B1 | * | 12/2002 | Leung ........................ 370/338 |
| 6,571,289 | B1 | * | 5/2003 | Montenegro ................ 709/227 |

OTHER PUBLICATIONS

C. Perkins, Request for Comments 2002 (Oct. 1996).

* cited by examiner

*Primary Examiner*—Glenton B. Burgess
*Assistant Examiner*—Kimberly Flynn
(74) *Attorney, Agent, or Firm*—McDonnell Boehnen Hulbert & Berghoff

(57) **ABSTRACT**

In mobile IP wireless data networking, methods are described for correctly routing packets through a foreign agent to or from wireless nodes where the wireless nodes have the same home network IP address. Instead of using normal IP routing, the foreign agent uniquely identifies the wireless node's home network IP address and home agent IP address with a PPP link address associated with a PPP link between the foreign agent and the wireless node. This association between PPP link addresses, home agent IP addresses, and home network IP addresses, is preferably implemented in software as a table stored in the foreign agent. The routing of packets through the foreign agent to the mobile nodes is performed by reference to the table. The table allows the foreign agent to correctly and efficiently route packets in the situation where multiple wireless nodes are registered with the foreign agent, but more than one of the wireless nodes have the same home network IP address.

**15 Claims, 4 Drawing Sheets**





Fig. 1

## Fig. 2

### TUNNEL TABLE 50

| PPP LINK ADDRESS | HOME AGENT IP ADDRESS | HOME IP ADDRESS |
|---|---|---|
| $x_1.x_2.x_3.2$ | $y_1.y_2.y_3.4$ | $z_1.z_2.z_3.4$ |
| $x_4.x_5.x_6.3$ | $p_1.p_2.p_3.6$ | $z_1.z_2.z_3.4$ |
| $x_7.x_8.x_9.1$ | $g_1.g_2.g_3.5$ | $z_1.z_2.z_3.4$ |
| $x_2.x_1.x_6.5$ | $h_1.h_2.h_3.2$ | $z_1.z_4.z_7.6$ |
| ... | ... | ... |

60 →
62 →

**Fig. 3**



MOBILE NODE TO HOME AGENT

70
ESTABLISH PPP LINK BETWEEN FA AND NODE

72
REGISTER NODE

74
SAVE PPP LINK ADDRESS, FOREIGN AGENT
IP ADDRESS, AND HOME IP ADDRESS IN TABLE

90
RECEIVE PACKET FROM NODE

92
ENCAPSULATE PACKET PER MOBILE IP

94
FORWARD PACKET TO HOME AGENT

NO — IS SESSION OVER ?

YES

END

## Fig. 4



HOME AGENT TO MOBILE NODE

```
                                                    ┌70
┌──────────────────────────────────────────────┐
│   ESTABLISH PPP LINK BETWEEN FA AND NODE       │
└──────────────────────────────────────────────┘
                      │
                      ▼                             ┌72
┌──────────────────────────────────────────────┐
│              REGISTER NODE                      │
└──────────────────────────────────────────────┘
                      │
                      ▼                             ┌74
┌──────────────────────────────────────────────┐
│   SAVE PPP LINK ADDRESS, FOREIGN AGENT          │
│   IP ADDRESS, AND HOME IP ADDRESS IN TABLE      │
└──────────────────────────────────────────────┘
                      │
                      ▼                             ┌76
┌──────────────────────────────────────────────┐
│       RECEIVE PACKET FROM HOME AGENT            │
└──────────────────────────────────────────────┘
                      │
                      ▼                             ┌78
┌──────────────────────────────────────────────┐
│            DECAPSULATE PACKET                   │
└──────────────────────────────────────────────┘
                      │
                      ▼                             ┌80
┌──────────────────────────────────────────────┐
│     REFER TO TABLE FOR TUNNEL INFORMATION       │
└──────────────────────────────────────────────┘
                      │
                      ▼                             ┌82
┌──────────────────────────────────────────────┐
│    FORWARD PACKET TO PPP LINK PER TABLE         │
└──────────────────────────────────────────────┘
                      │
                      ▼           84
            ┌────IS───┐
      NO   ◄│  SESSION │
            │   OVER   │
            │    ?     │
            └──────────┘
                 │ YES
                 ▼
             ( END )
```

US 6,684,256 B1

**1**

## ROUTING METHOD FOR MOBILE WIRELESS NODES HAVING OVERLAPPING INTERNET PROTOCOL HOME ADDRESSES

### BACKGROUND OF THE INVENTION

A. Field of the Invention

This invention relates to the subject of mobile Internet Protocol ("IP") data networking.

B. Description of Related Art

Public packet switched networks can be used to carry traffic to and from a mobile communications device, such as a laptop computer or personal digital assistant equipped with a cellular telephone modem. The basic architecture of mobile IP data networking is known in the art and described in several publications, including the Request for Comments document RFC 2002 (1996) and in the textbook of Charles E. Perkins, *Mobile IP Design Principles and Practices*, Addison-Wesley Wireless Communications Series (1998), the contents of both of which are incorporated by reference herein.

Basically, in Mobile IP communication, a wireless mobile node communicates with a terminal on an IP network by means of a foreign agent and a home agent. Typically, foreign agent functionality is incorporated into a network access server chassis located on a mobile node's visited network. The foreign agent provides routing services for the mobile node while it is registered with the foreign agent. A Point-to-Point Protocol (PPP) session is established between the mobile node and the foreign agent. The foreign agent de-tunnels and delivers datagrams to the mobile node that were tunneled by the mobile node's home agent.

The home agent is usually a router on a mobile node's home network that tunnels datagrams for delivery to the mobile node via the foreign agent when the mobile node is away from home. The home agent maintains current location information for the mobile node, through a variety of possible mechanisms, such as described in the patent application of Richard J. Dynarski, et al., "Dynamic Allocation of Wireless Mobile Nodes Over an Internet Protocol (IP) Network", serial no. 09/233,381, which is incorporated by reference herein. When multiple home agents are handling calls for multiple mobile nodes simultaneously, the home agents are providing, in essence, a service analogous to virtual private network services. Each mobile node is typically associated with a separate home network. The routing path from that home network, through the home agent, to the foreign agent and mobile node is like a virtual private network for the mobile node.

The situation can arise in which two mobile nodes are simultaneously registered with a foreign agent, and have established a PPP session with the foreign agent, and the two mobile nodes have the same home network IP address. In a typical prior art foreign agent implementations the overlapping IP addresses will cause an IP routing failure, since more than one routing table entry could have the same network address associated with different PPP links. This overlapping IP address for both mobile nodes could be a consequence of the home network assigning the same IP address to the mobile node, either a priori or during the mobile IP registration process.

Accordingly, there is a need in the art for a method for handling overlapping IP address pools in a foreign agent. The present invention solves that need and provides methods by which a foreign agent can correctly route packets to a

**2**

from any number of mobile nodes that are simultaneously registered with the foreign agent but have the same home network IP address.

### SUMMARY OF THE INVENTION

In a first aspect, a method is provided for routing a data packet through a foreign agent to a wireless node. The method is specifically designed to handle the situation where multiple wireless nodes are registered with the foreign agent but have the same home network IP addresses. The method begins by receiving a data packet at the foreign agent from a home agent associated with wireless node. The foreign agent uniquely associates a home Internet Protocol (IP) address and a home agent IP address contained in the data packet with a Point-to-Point Protocol (PPP) link address. The PPP link address is associated with a PPP link previously established between the foreign agent and the wireless node. This association is preferably implemented in a software table. The foreign agent forwards the data packet through the foreign agent to the wireless node (with the addressing done by reference to the table) for transmission to the wireless node.

In a preferred implementation, the foreign agent maintains a table mapping PPP link addresses to unique pairs of home IP addresses and home agent IP addresses. The step of associating the incoming packet from the home agent is performed automatically in the foreign agent by reference to the table. Since each wireless node having the same home network IP address will have a different home agent, multiple wireless nodes having the same home IP addresses but different home agent IP address may be distinguished from each other in the table and the foreign agent can correctly identify the PPP link to forward the packet to the proper wireless node.

In the reverse direction, the foreign agent receives packets from the wireless nodes, and some of the wireless nodes may have the same home network IP addresses. However, the wireless nodes having the same home network IP address will be associated with a separate PPP link. Be reference to the table, the foreign agent can determine which home agent to forward the packet to, since the home agents are uniquely identified with a home agent IP address and a PPP link address associated with the packet received from the wireless node. The result is that in both directions, the foreign agent can handle the situation where multiple wireless nodes are active in the foreign agent but have the same home network IP address. If conventional IP routing methods were performed, this would not be possible.

These and other features and aspects of the invention will be described in further detail in the following specification.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic diagram showing the basic architecture for providing mobile IP networking services for a plurality of wireless nodes, two of which happen to have the same home network IP address.

FIG. 2 is a illustration of a portion of the table that is maintained in the foreign agent that is used to route packets to the wireless nodes and to the home agents in accordance with a principal aspect of the invention.

FIG. 3 is a flow diagram illustrating the method performed by the foreign agent for forwarding of packets from mobile nodes to their respective home agent.

FIG. 4 is a flow diagram illustrating the method implemented in the foreign agent for forwarding of packets from the home agent to the mobile nodes.

US 6,684,256 B1

**3**

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT OF THE INVENTION

### Overview of Representative Network System for Mobile IP Nodes

Referring now to FIG. 1, a basic architecture for providing IP networking services for a group of mobile nodes is shown schematically. In the example of FIG. 1, two wireless users, designated 10A and 10B, exchange IP packets with host computers on their home networks 11A and 11B, respectively. The wireless users or nodes send and receive IP packets by means of a radio access network 12 (the details of which are not important) and a PPP link 16 established with a remote access server 13 functioning as a mobile IP foreign agent (also known in the art as an IWU/FA or Interworking Unit/Foreign Agent). The foreign agent 13 has an IP address (e.g., "C") which is used for tunneling data packets from the home agents 20 to the foreign agent in accordance with the mobile IP protocol.

The foreign agent 13 is on a network 14 maintained by a provider of mobile IP service, such as a wireless communications company or other suitable entity. The foreign agent 13 may be of the general type of device described in the patent of Dale M. Walsh et al., U.S. Pat. No. 5,528,595 and assigned to the assignee of the present invention. Such network access servers are available from companies such as 3Com Corporation and Lucent Technologies. Basically, the network access server/foreign agent implements foreign agent functions as specified by RFC 2002 and provide access to an IP local or wide area network 14 for the mobile nodes.

IP packets for the mobile devices are tunneled to the foreign agent 13 by a home agent in accordance with the Mobile IP protocol. In the example of FIG. 1, a home agent 20A for mobile node 10A is connected by one more intermediate networks 22 to the home network 11A for the mobile wireless node 10A. Similarly, the IP packets from the home network 11B are transmitted over one or more intermediate networks to the home agent 20B, where they are tunneled to the foreign agent 13 for transmission to the mobile wireless node 10B.

Each home agent 20 typically comprises a router with an interface to the local area network 14 and a wide area network interface that connects the home agent to intermediate networks 22 (which may be an Asynchronous Transfer Mode network, frame relay network, or other type of network). The backhaul network 22 is in turn connected via suitable routers to the individual home networks 11A, 11B of the mobile nodes 10A, 10B respectively.

In the present example, mobile nodes 10A and 10B are assigned the same home IP address, say "A". Both of them are connected to the same foreign agent and have the same mobile IP foreign agent care-of-address of "C" (IP address of foreign agent 13), for tunneling purposes. Ideally, the foreign agent 13 tunnels traffic from the mobile node 10A to the home agent 20A, which in turn routes it via intermediate networks to the home network 11A for the mobile node. Similarly, the foreign agent 13 tunnels traffic from the mobile node 10B to the home agent 20B, which in turn routes it via intermediate networks to the home network 11B for the mobile node.

The problem with this situation is that, with both mobile nodes having the same IP addresses on their home networks, if the foreign agent 13 uses conventional IP routing schemes (as is the case for remote access servers), it would not be

**4**

able to properly route the IP packets from the mobile nodes to the home agents. Similarly, in the opposite direction the foreign agent 13 would not be able to determine which mobile node 10A or 10B the packet is intended for since the mobile nodes have the same home network IP address.

The present invention addresses this problem. Instead of using conventional IP routing, a preferred embodiment of the invention associates the address of the PPP link 16 between the mobile node and the foreign agent to the IP tunneling information needed to correctly route the packets to the proper home agent. In the direction of home agent to mobile node, the foreign agent receives a data packet associated with one of the wireless nodes from the respective home agent. The foreign agent maintains a tunneling table associating a home network IP address and a home agent IP address contained in the data packet with a Point-to-Point Protocol (PPP) link address in the foreign agent. The PPP link address identifies the PPP link that is established between the foreign agent and the wireless node. Since the home agent IP address and home network IP address form a unique pair or set of information, they can be used to uniquely and correctly identify the associated PPP link for the packet and accordingly can be used to tie any IP packets from the foreign agent to and from the mobile node via the table. The foreign agent forwards the data packet to the PPP link for transmission to the mobile node by reference to the table.

FIG. 2 is an illustration of a representative tunneling table 50 maintained in software by the foreign agent and used to correctly route packets to and from the mobile nodes when the overlapping IP pool situation is presented. FIGS. 3 and 4 illustrate the method in detail.

With reference to FIGS. 2–4, the process begins at step 70 when a PPP link or session is established between the mobile node 10A or 10B and the foreign agent 13. During establishment of the session and negotiation of protocols, such as IP Control Protocol (IPCP), the foreign agent will allow the same IP address assignment for the mobile node, that is, it will disregard the fact that another mobile node is registered with the foreign agent with the same IP address.

Once the PPP link negotiation is completed, the foreign agent will perform mobile IP discovery procedures and wait for registration request messages from the mobile node. When a registration request message is received the foreign agent proceeds with registering with mobile node, indicated in step 72.

Once registration of the mobile node is completed, the home network IP address, home agent IP address and PPP link addresses are saved in a tunneling table, as indicate at step 74, such as the table illustrated in FIG. 2. The tunneling table can only be created after a successful registration of the mobile node because a mobile client could request dynamically a home IP address assignment at the network layer.

In the table of FIG. 2, the numbers $x_1.x_2.x_3.2$, $y_1.y_2.y_3.4$, $z_1.z_2.z_3.4$, $g_1.g_2.g_3.5$ etc. are intended to simply represent some particular IP addresses that are assigned to the PPP link in the foreign agent, the home agent, and the mobile node on the home network. The home agent IP address (e.g., $p_1.p_2.p_3.6$) and home network IP address (e.g. $z_1.z_2.z_3.4$) form a unique pair of identifiers and provide a unique PPP link address. Note that the first two entries 60 and 62 in the table 50 have the same home network IP address ($z_1.z_2.z_3.4$), but, since they have different home agent IP addresses, they have different PPP link addresses. Thus, the packets can be correctly routed to and from the mobile nodes by maintaining a table such as illustrated in FIG. 2 and using the table

en

US 6,684,256 B1

<table>
<tr><td>5</td><td>6</td></tr>
</table>

to either identify the proper PPP link for the home agent (for traffic destined for the mobile node), or to identify the proper home agent for the mobile node (for traffic received from the mobile node and destined for the host computer on the home network).

Thus, in the forward direction, and with reference to FIG. 4, an IP packet is received by the foreign agent through the IP tunnel from the home agent at step 76. The packet is decapsulated at step 78. The PPP link to forward the packet to is identified at step 80 by the outer source of the IP datagram (i.e., the home agent IP address), and the inner destination address in the datagram (i.e., the home network IP address of the mobile node). The foreign agent refers to the table of FIG. 2 to determine the PPP link to send the packet to There is no IP routing performed in this case. The packet is forwarded at step 82 to the proper PPP link. The foreign agent then waits for another packet from the home agent at step 84 and repeats steps 76, 78, 80 and 82 for subsequent packets. Of course, this process is running in parallel in the foreign agent for all the active ports and registered mobile nodes.

In the opposite direction, and with reference to FIG. 3, a packet is received from the mobile node at step 90. The packets received via each PPP link in the foreign agent is encapsulated at step 92 in accordance with the mobile IP protocol and tunneled to the proper home agent at step 94. The tunneling table of FIG. 2 is used to generate the tunneling information based on the unique set of mobile node home network IP address and PPP link address to arrive at the proper home agent IP address for tunneling the packet to the home agent.

In accordance with this method, multiple wireless nodes having the same home IP addresses but different home agent IP address may be distinguished from each other in the tunneling table and proper routing in both directions can be performed.

In the preferred embodiment, the foreign agent comprises a remote access server having a plurality of ports (such as 24, 48, or even 200 or more in a high density embodiment). The remote access server is provided with appropriate software and hardware for establishing a PPP link with a wireless node at each port. Each port has its own PPP link address. Further, the table shown in FIG. 2 is increased, to provide routing information for all the PPP link addresses associated with the ports.

From the forgoing, it will be appreciated that we have described an improvement to a foreign agent for a plurality of wireless nodes, in which the improvement comprises providing a software program in the foreign agent for handing routing of packets through the foreign agent for the plurality of wireless nodes having a common or overlapping home network address. The software program will typically run on either a routing card or general purpose computing platform incorporated into the foreign agent. Typically, the routing card or computing platform provides an interface between the foreign agent and a local or wide area IP network. The software program comprising a set of instructions:

    (a) maintaining a table (such as shown in FIG. 2) uniquely identifying links (that connect the foreign agent to the plurality of wireless nodes) to home agent addresses and home network addresses for the wireless nodes; and

    (b) associating packets to be transmitted to the wireless nodes by the uniquely identified links.

Accordingly, and as explained above, wireless nodes having the same home network addresses but different home

agent addresses may be distinguished from each other in the table and proper routing of packets through the foreign agent to or from the wireless nodes may be achieved. Persons skilled in the art and familiar with mobile IP data networking and foreign agents will be able to code such software instructions from the present description without undue difficulty. For example, the instructions may encode the procedure shown in FIGS. 3 and 4. The procedures for establishing PPP links with mobile nodes and registering of mobile nodes with a foreign agent, are known in the art and described in the mobile IP data networking literature.

Persons skilled in the art will appreciate that various modifications and alterations, from the presently preferred embodiment can be made without departure from the true scope and spirit of the invention. This true scope and spirit is defined by the appended claims, to be interpreted in light of the foregoing.

We claim:

1. A method of routing a data packet through a foreign agent to a wireless node, comprising the steps of:

    receiving said data packet at said foreign agent from a home agent associated with said wireless node;

    associating, in said foreign agent, a home Internet Protocol (IP) address and a home agent IP address contained in said data packet with a Point-to-Point Protocol (PPP) link address, said PPP link address associated with a PPP link established between said foreign agent and said wireless node; and

    forwarding said data packet through said foreign agent to said PPP link for transmission to said wireless node.

2. The method of claim 1, wherein said foreign agent maintains a table mapping PPP link addresses to unique pairs of home IP addresses and home agent IP addresses, and wherein said step of associating is performed automatically in said foreign agent by reference to said table, whereby multiple wireless nodes having the same home IP addresses but different home agent IP address may be distinguished from each other in said table.

3. The method of claim 2, wherein said foreign agent comprises a remote access server having a plurality of ports, each port for establishing a PPP link with a wireless node.

4. In a foreign agent for a plurality of wireless nodes, an improvement comprising:

    providing a software program in said foreign agent for handing routing of packets through said foreign agent for said plurality of wireless nodes having a common home network address, said software program comprising a set of instructions:

        (a) maintaining a table uniquely identifying links that connect said foreign agent to said plurality of wireless nodes to home agent addresses and home network addresses for said wireless nodes; and

        (b) associating packets to be transmitted to said plurality of wireless nodes to the uniquely identified links,

    whereby wireless nodes having the same home network addresses but different home agent addresses may be distinguished from each other in said table and proper routing of packets through said foreign agent to or from said wireless nodes may be achieved.

5. The improvement of claim 4, wherein said table comprises a tunneling table, said tunneling table comprising a plurality of entries, each of said entries corresponding to a respective wireless node of said plurality of wireless nodes, wherein each of said entries comprises:

    a PPP link address;

US 6,684,256 B1

7

a home agent Internet protocol (IP) address; and

a home IP address.

6. The improvement of claim 4, wherein said set of instructions comprises:

establishing a point-to-point protocol (PPP) link between a foreign agent (FA) and a respective wireless node of said plurality of wireless nodes;

registering said respective wireless node with said FA;

creating an entry in said table, the entry comprising:

a PPP link address

a FA Internet protocol (IP) address; and

a home IP address;

receiving a data packet from said respective wireless node at said FA;

encapsulating said packet;

forwarding said packet to a home agent.

7. The improvement of claim 4, wherein said set of instructions are executed by a routing card providing an interface between said foreign agent and an Internet Protocol (IP) network.

8. The improvement of claim 4, wherein said foreign agent comprises a remote access server.

9. The improvement of claim 8, wherein said remote access server provides at least 24 ports capable of establishing PPP links with at least 24 wireless mobile nodes, and wherein each of said PPP links is uniquely identified in said table.

10. The improvement of claim 8, wherein said home agent address comprises a home agent Internet Protocol (IP) address, wherein said home network address comprises a home IP address, and wherein said said link is uniquely identified by a Point-to-Point Protocol (PPP) link address.

11. A method of routing a data packet through a foreign agent to a mobile wireless node, comprising the steps of:

establishing a Point-to-Point Protocol (PPP) link between said foreign agent and said node, said PPP link having a PPP link address;

processing a registration request message from said node and registering said node;

storing in a table a home agent Internet Protocol (IP) address for a home agent for said node, a home IP address for said node, and a PPP link address for said node; said home Agent IP address and said home IP address uniquely associated with said PPP link address in said table;

receiving a packet from said home agent;

decapsulating said packet; and

forwarding said packet to said PPP link, said step of forwarding performed by reference to said table.

12. A method of routing a data packet through a foreign agent from a wireless node to a home agent, comprising the steps of:

establishing a Point-to-Point Protocol (PPP) link between said foreign agent and said node, said PPP link having a PPP link address;

processing a registration request message from said node and registering said node;

8

storing in a table a home agent Internet Protocol (IP) address for said home agent for said node, a home IP address for said node, and a PPP link address for said node, said home Agent IP address and said home IP address uniquely associated with said PPP link address in said table;

receiving a packet from said node via said PPP link;

encapsulating said packet; and

forwarding said packet to said home agent, said step of forwarding performed by reference to said table to determine said home agent IP address from said PPP link address.

13. In a foreign agent for a plurality of wireless nodes, an improvement comprising:

providing a software program in said foreign agent for handling routing of packets through said foreign agent for said plurality of wireless nodes having a common home network address, said software program comprising a set of instructions:

(a) maintaining a table uniquely identifying links that connect said foreign agent to said plurality of wireless nodes to home agent addresses and home network addresses for said wireless nodes; and

(b) associating packets received from said wireless nodes at said foreign agent to home agents for said wireless nodes,

whereby multiple wireless nodes having the same home network addresses but different home agent addresses may be distinguished from each other in said table and proper routing of packets through said foreign agent to said home agents may be achieved.

14. The improvement of claim 13, wherein said table comprises a tunneling table, said tunneling table comprising a plurality of entries, each of said entries corresponding to a respective wireless node of said plurality of wireless node, wherein each of said entries comprises:

a PPP link address;

a home agent Internet protocol (IP) address; and

a home IP address.

15. The improvement of claim 13, wherein said set of instructions comprises:

establishing a point-to-point protocol (PPP) link between a foreign agent (FA) and a respective wireless node of said plurality of wireless nodes;

registering said respective wireless node with said FA;

creating an entry in said table, the entry comprising:

a PPP link address;

a FA Internet protocol (IP) address; and

a home IP address;

receiving a packet from a home agent at said FA, said packet being for delivery to said respective wireless node;

decapsulating said packet to obtain an IP datagram;

forwarding said packet to said respective wireless node based on a comparison of said datagram with said entry in said table.

*  *  *  *  *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.      : 6,684,256 B1                                      Page 1 of 1
DATED           : January 27, 2004
INVENTOR(S)  : Chandra Warrier and Yingchun Xu

It is certified that error appears in the above-identified patent and that said Letters Patent is
hereby corrected as shown below:

Column 6,
Line 24, please delete "(EP)" and substitute -- (IP) --

Column 8,
Line 40, please delete "EP" and substitute -- IP --

Signed and Sealed this

Fifteenth Day of June, 2004

JON W. DUDAS
*Acting Director of the United States Patent and Trademark Office*